**SPM CORPORATION, Appellant,**

v.

**M/V MING MOON; Blue Anchor Line, division of Transpac Container System, Ltd.; Yangming Marine Transport Corporation; and Maher Terminals, Inc.**

No. 91–5764.

United States Court of Appeals, Third Circuit.

Argued April 10, 1992.

Decided June 10, 1992.

Anthony J. Pruzinsky and Frances C. Peters (argued), Hill, Rivkins, Loesberg, O'Brien, Mulroy & Hayden, Newark, N.J., for SPM Corp.

Ernest H. Gelman (argued), Goldberg & Gelman, New York City, for Blue Anchor Line.

James M. Kenny (argued), Kenny & Stearns, Newark, N.J., for Yangming Marine Transport Corp. and Maher Terminals, Inc.

Before: BECKER, COWEN, and GARTH, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

In this admiralty action, the plaintiff-appellant SPM Corporation ("SPM") sued to recover some $228,000 in damages incurred when stevedores negligently dam-

aged cargo during a restowage operation at Elizabeth, New Jersey, an intermediate port of call on the route from Yokohama, Japan, to Norfolk, Virginia. SPM, the importer of the goods, appeals from the district court's order awarding it only $500 in damages from each of three defendants: Blue Anchor Line ("Blue Anchor"), which arranged the shipment; Yangming Marine Transport Corporation ("Yangming"), the actual carrier and the owner of the *M/V Ming Moon*, a nominal defendant and the vessel that carried the cargo; and Maher Terminals, Inc. ("Maher"), which employed the stevedores who damaged the cargo.

SPM appeals on three grounds. First, it claims that Blue Anchor's limitation on liability was two dollars per kilogram, rather than the default $500 per package under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1304(5) (1988). We agree that under Blue Anchor's bill of lading, Blue Anchor's liability was limited to $40,800 instead of $500. SPM also contends that the restowage of cargo at Elizabeth was an "unreasonable deviation" depriving all the defendants of contractually limited liability. We disagree, holding that the category of non-geographical "quasi-deviations" must be narrowly construed, and does not include actions, such as restowage at intermediate ports, that are customary in the maritime trade.

Finally, SPM argues that, at all events, Maher was liable for the full amount of damages because the contractual liability limitations available to Blue Anchor and Yangming did not extend to Maher. We again disagree, holding that the "Himalaya clause" in Yangming's bill of lading validly extended Yangming's $500 limitation on liability to Maher. We will therefore affirm in part, reverse in part, and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

The facts are not in dispute. SPM was the owner and importer of certain plastic injection molding machines that were shipped from Yokohama, Japan, to Nor-folk, Virginia, in June 1988. The shipment consisted of three crates; the one that was eventually damaged weighed 20,400 kilograms. SPM had purchased the machinery for $243,000, and had arranged to resell it to a third party, Canon USA, Inc., for $255,000.

The manufacturer and shipper of the machines, Sumitomo Heavy Industries ("SHI"), engaged Blue Anchor to arrange for transport of the machines. Blue Anchor is a "non-vessel-operating common carrier" or "NVOCC," which is "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier," 46 U.S.C.App. § 1702(17). Blue Anchor issued an ocean bill of lading (the "Blue Anchor bill of lading") for the shipment, which was negotiated to SPM, the consignee. As NVOCC, Blue Anchor never actually handled the cargo, and instead subcontracted with Yangming to perform the actual ocean carriage on board the *Ming Moon*, a container vessel. Yangming issued its own ocean bill of lading ("the Yangming bill of lading") to Blue Anchor's agent in Japan, Kuehne & Nagel (Japan), Ltd. The district court found that Kuehne & Nagel was the agent for SPM as well as for Blue Anchor.

The *Ming Moon* followed its published itinerary and put in at Los Angeles, California, and Savannah, Georgia, before stopping on July 8, 1988 at another intermediate port, Port Elizabeth, New Jersey, which is part of the Port of New York. At Port Elizabeth, Maher, Yangming's contract stevedore there, restowed SPM's cargo. More specifically, pursuant to Yangming's instructions, Maher's employees removed SPM's cargo from the vessel in order to stow other cargo in the lower hold of the *Ming Moon*, and reloaded SPM's cargo on board the ship. Although SPM's cargo had been originally stowed in Japan in a location readily accessible for unloading at Norfolk, Yangming ordered the restowage to make room for other cargo on the return trip to Japan and to have SPM's oversized cargo relocated so that it would remain accessible for discharge at Norfolk. Ac-

cording to the district court's finding of fact, restowage is a common practice in the maritime trade.

The parties have stipulated that during this restowage, one of SPM's packages was damaged due to negligence by Maher's employees. After the cargo was delivered in Norfolk, the damaged package was declared a constructive total loss. SPM recovered approximately $15,000 in salvage parts, but, according to another stipulation of the parties, suffered a net loss of approximately $228,000. SPM then sued Blue Anchor, Yangming, and Maher, seeking recovery of its damages. Blue Anchor cross-claimed against Yangming and Maher, seeking indemnification (including attorney's fees expended in defending the action) if it were found liable for any damages that each owed to SPM.

The district court had jurisdiction over this admiralty case under 28 U.S.C. § 1333 (1988) and Federal Rule of Civil Procedure 9(h). The case was tried to the district court sitting without a jury, based on stipulated facts, documentary evidence, and deposition transcripts. SPM has appealed from the court's order dated August 26, 1991, which, among other things, found Blue Anchor, Yangming, and Maher liable to SPM, but only in the amount of $500 each, plus prejudgment interest. The district court also ruled that Blue Anchor was entitled to indemnification from Yangming and Maher, including reasonable attorney's fees, but the amount of those fees has yet to be resolved.

## II. APPELLATE JURISDICTION

■ Although the parties submit that we have appellate jurisdiction over a final order of the district court under 28 U.S.C. § 1291 (1988), we disagree. Because the amount of Blue Anchor's reasonable attorney's fees has not been set, the extent of Yangming's and Maher's total liability, including indemnification of Blue Anchor, has not been determined. Accordingly, the district court's order was not final, even though SPM's rights have been fully determined. See *Vargas v. Hudson County Board of Elections*, 949 F.2d 665, 668–70

(3d Cir.1991) (where attorney's fees are sought as part of damages, and not as prevailing party, rule of *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988), does not apply, and district court's ruling is not final until amount of fees is fixed).

■ Nevertheless, we conclude that we do have jurisdiction over SPM's appeal under 28 U.S.C. § 1292(a)(3) (1988). That provision grants courts of appeals jurisdiction over interlocutory admiralty decrees that have determined the rights and liabilities of the parties, even if the dollar amount of damages has not been fixed. See *Salazar v. The Atlantic Sun*, 881 F.2d 73, 75 (3d Cir.1989); *Kingstate Oil v. M/V Green Star*, 815 F.2d 918, 921–22 (3d Cir.1987). Such is the situation with SPM's appeal. We now give plenary review to the district court's conclusions of law, while we review its findings of facts only for clear error.

## III. BLUE ANCHOR'S DAMAGE LIMITATION

■ The first ground of SPM's appeal is that the district court improperly limited Blue Anchor's liability to $500. The parties agree, and the district court concluded, that COGSA applies to the Blue Anchor bill of lading by terms of the Act itself. Under 46 U.S.C.App. § 1300, COGSA controls bills of lading that evidence a contract of carriage of goods by sea to or from the United States and in foreign trade. Carriage of goods covers the period from when the goods are loaded on to when they are discharged from the ship. 46 U.S.C.App. § 1301(e). We agree with the district court that "discharge" means the removal of the goods at their final port of destination, and hence COGSA also covered the temporary unloading at Port Elizabeth.

COGSA contains a default limitation of liability for issuers of bills of lading:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ... unless the nature and value of such goods have

been declared by the shipper before shipment and inserted in the bill of lading....

By agreement between the carrier ... and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.

. . . . .

46 U.S.C.App. § 1304(5). In this case, the shipper, SHI, did not declare a higher value on the bill of lading,[1] and therefore COGSA limited Blue Anchor's liability to $500 per package, unless Blue Anchor and SHI contractually agreed to a higher damage limitation. Whether Blue Anchor and SHI did so in the Blue Anchor bill of lading is the crux of the issue before us.

Part IV of the Blue Anchor bill of lading is entitled "Liability." Two of its boilerplate paragraphs are relevant here. Paragraph 17 covers "Responsibility of the LINE," and subparagraph (A) covers "Port to Port Shipment."[2] Paragraph 17(A), clause 1) essentially incorporates COGSA's damage limitations into the contract:

When the carriage called for by this Document[ ] is a Port to Port shipment, then during any time when the LINE has any responsibility by law or otherwise with respect to the Goods, the liability of the LINE for loss of or damage to the Goods shall be determined in accordance with ... the US Carriage of Goods by Sea Act, 1936....

Paragraph 18, entitled "Limitation Amount," however, contains a specific liability limitation amount:

18.3. Compensation shall not exceed US $2,— per kilogram of gross weight of the Goods lost or damaged.

SPM argues that Paragraph 18.3 was a contractual agreement to deviate from the COGSA default of $500 per package, and hence is binding on Blue Anchor.[3] The district court disagreed. It found no inconsistency between the paragraphs. It noted that Paragraph 18.3 simply provided a cap on Blue Anchor's liability, as did Paragraph 17(A); the lower of the two caps would apply. The court also suggested that Paragraph 18.3, as a general provision, could not supersede the specific limitation in Paragraph 17(A).

If the district court was correct that Paragraphs 17(A) and 18.3 are consistent, then those paragraphs are consistent in a different way than the court concluded. Paragraph 17(A) incorporates COGSA (which already applied by its own force to this bill of lading), and 46 U.S.C.App. § 1304(5) expressly allows parties to agree to a higher limitation amount—either by declaring a higher value on the bill of lading (the first paragraph of that subsection) or by contractual agreement (the second). Thus, even though SHI did not declare a the full value of the goods on the bill of lading and thereby abrogate the $500 per package limitation, arguably Paragraph 18.3 was a contractual variation from the COGSA default.

On the other hand, one can read Paragraphs 17(A) and 18.3 simply to conflict— the former providing the default $500 per package limitation and the latter providing a two dollar per kilogram limitation. If that reading is correct, we agree with the district court that specific provisions override general ones. But if so, in our view Paragraph 18.3 was the specific provision that controls. Paragraph 17 is entitled "Responsibility of the LINE," and mentions no specific liability limitation amount; the $500 per package limitation was merely incorporated by reference. Paragraph

---

1. Although the Blue Anchor bill of lading contained no specific space marked for declarations of higher value, the district court ruled that the large space available for descriptions of the goods provided a fair opportunity for SHI to declare the actual value of the goods. SPM has not appealed that ruling.

2. Paragraph 17(B) covers "Combined Transport" (transport involving more than one mode of transport) and is inapplicable here.

3. COGSA allows only upward contractual deviations on maximum liability, but in this case the two dollar per kilogram limitation would yield a liability of Blue Anchor for $40,800.

18.3, in contrast, is entitled "Limitation Amount," a far more specific appellation, and contains a precise dollar limitation.[4]

At the very least, the Blue Anchor bill of lading is an ambiguous form contract, and, as such, must be construed against its drafter, Blue Anchor. See, for example, *Mitsui & Co. v. American Export Lines*, 636 F.2d 807, 822–23 (2d Cir.1981). If Blue Anchor had wanted the $500 per package limitation to control, it could easily have imposed that limitation directly (in terms) or indirectly (by not including any clauses that appear to alter the COGSA default).

Blue Anchor offers a different argument to uphold the ruling of the district court. It suggests that the two dollar per kilogram limitation of Paragraph 18.3 applies only to combined transports, while the COGSA limitation of $500 applies to port-to-port shipments under Paragraph 17(A). Blue Anchor notes that since COGSA was adopted by the United States in 1936, some maritime nations have adopted the Hague–Visby Amendments, which base liability on weight, not per package. It notes that Japan, the country of shipment, has not adopted the Hague–Visby amendments, so they did not compulsorily apply to this shipment.

The problem with Blue Anchor's argument, however, is that nothing in Paragraph 18.3 suggests that it applies only to combined transports or to Hague–Visby transports. In Paragraph 17, the drafters distinguished between the two types of shipments, yet no such limitation appears in Paragraph 18, implying that Paragraph 18 applies to all shipments. No mention of the Hague–Visby Amendments appears anywhere in the bill of lading. Moreover, even if the contract were latently ambigu-

ous on this score, we would construe it against its drafter, Blue Anchor.

We therefore conclude that the Blue Anchor bill of lading overrode the COGSA default liability limitation of $500 per package, and instead limited Blue Anchor's liability to two dollars per kilogram, or $40,-800. We next determine whether even that contractual ceiling applies.

## IV. RESTOWAGE AS A DEVIATION ABROGATING LIABILITY LIMITS

SPM argues that no liability limitation should apply as to any of the defendants because the restowage of its cargo by Yangming and Maher constituted a "deviation" from the carriage agreement that converted the carriers into quasi-insurers liable in full for any damage incurred as a result. The defendants counter that the harsh doctrine of deviation should be limited to carriers' geographical departures from course and to unauthorized on-deck stowage of cargo, and should not be extended to a customary practice such as restowage at an intermediate port.

The origins and development of the doctrine of deviation are well described elsewhere. See generally Michael F. Sturley, 2A *Benedict on Admiralty* § 121 at 12–1 to 12–6 (7th ed. 1992); Steven Friedell, *The Deviating Ship*, 32 Hastings L.J. 1535 (1981). As we recently noted:

> At common law, deviation from a scheduled voyage stripped a carrier of many of its defenses and made the carrier the insurer of the goods that it was carrying. Courts viewed such deviations as a breach of contract and held carriers liable for the loss of goods resulting therefrom.

**4.** Judge Garth is of the view that paragraph 18.3, the "limitations" clause of the Blue Anchor Line bill of lading, cannot substitute for a declaration of value. Because SHI did not follow the prescribed procedure to insure its merchandise for its value—a value which was conceded to be in excess of $200,000—and because SHI, thereby, declined to pay the requisite higher premium charge, SPM should not be heard at this point to claim that SHI had contracted for the "limitations" value of $40,800.

As noted in text, the shipment went forward under a bill of lading that provided for a liability maximum of $500 (Paragraph 17) and a $2 per kilogram limitation amount (Paragraph 18.-3). In Judge Garth's view, it is the ambiguity caused by these two clashing provisions, in the context of SHI's failure to insure its merchandise for value, that requires the bill of lading to be construed against Blue Anchor Line.

*Berkshire Fashions, Inc. v. The M.V. Hakusan II,* 954 F.2d 874, 883 (3d Cir.1992).

COGSA recognized the doctrine of deviation but circumscribed it:

Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this Act or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

46 U.S.C.App. § 1304(4).

By negative implication, COGSA recognizes that unreasonable deviations can violate the Act, and most courts have held that an unreasonable deviation also lifts a carrier's liability limitations, including the $500 per package limitation. See, for example, *Ingersoll Milling Machine Co. v. M/V Bodena,* 829 F.2d 293, 301 (2d Cir. 1987); *Nemeth v. General Steamship Corp.,* 694 F.2d 609, 612–13 (9th Cir.1982); *Spartus Corp. v. S/S Yafo,* 590 F.2d 1310, 1315–17 (5th Cir.1979). But see *Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt, G.m.b.H.,* 313 F.2d 872, 874–75 (7th Cir.1963) (statutory limitations apply, despite deviation). COGSA affirmatively provides, however, that reasonable deviations do not oust the contract of carriage (or COGSA limitations on liability), and the statute gives courts guidance on which deviations should be considered reasonable.

Unfortunately, COGSA does not define "deviation" itself, which is a predicate for reaching the distinct issues of reasonableness and the consequences of an unreasonable deviation. See 2A Sturley, *Benedict on Admiralty* § 122 at 12–6 to 12–7 (emphasizing that courts should not collapse the inquiries).[5] Lacking a statutory definition of "deviation," courts have offered various definitions of their own. This court's pre-COGSA, yet still widely quoted, definition is among the classics:

To deviate, lexicographically, means to stray, to wander. As applied in admiralty law, the term "deviation" was originally and generally employed to express the wandering or straying of a vessel from the customary course of the voyage, but in the course of time it has come to mean any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased, such as carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper, delay in carrying the goods, failure to deliver the goods at the port named in the bill of lading and carrying them farther to another port, or briging them back to the port of original shipment and reshipping them. Such conduct has been held to be a departure from the course of agreed transit and to constitute a "deviation" whereby the goods have been subjected to greater risks, and, when lost or damaged in consequence thereof, clauses of exceptions in bills of lading limiting liability cease to apply.

*G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt A.-G.,* 28 F.2d 249, 251 (3d Cir.1928).

Analysts distinguish between geographic deviations and other, "quasi-deviations." In this case, there was no geographical deviation: the *Ming Moon* followed its advertised course of voyage. See *General Electric Co. v. S.S. Nancy Lykes,* 706 F.2d 80 (2d Cir.1983) (illustrating the principles of geographic deviation). SPM's only serious claim is that restowage of cargo at an intermediate port constitutes a quasi-deviation.

Quasi-deviation is a doctrine seemingly entrenched in the law, but not, apparently, expanding in scope. The usual example has been unauthorized on-deck stowage of cargo. See, for example, *Constructores Tecnicos v. Sea–Land Service, Inc.,* 945 F.2d 841 (5th Cir.1991); *English Electric Valve Co. v. M/V Hoegh Mallard,* 814 F.2d

---

**5.** Although courts frequently assume deviation and skip to the reasonableness issue, we will not do so. Therefore SPM's insistence that Yangming's restowage of the SPM cargo was "for the purpose of loading or unloading cargo" (a test for reasonableness under the statute) does not help it over the preliminary hurdle of showing that the restowage was a deviation.

84 (2d Cir.1987). Plaintiffs have frequently pressed for expansion beyond that class of cases, but in recent years courts of appeals have generally declined to do so. See, for example, *B.M.A. Industries v. Nigerian Star Line*, 786 F.2d 90 (2d Cir.1986) (release of goods to person not holding necessary documents not a quasi-deviation); *C.A. Articulos Nacionales de Goma Gomaven v. M/V Aragua*, 756 F.2d 1156 (5th Cir.1985) (deviation not presumed when cargo loaded aboard ship but not delivered and carrier has no explanation); *Iligan Integrated Steel Mills v. S.S. John Weyerhaeuser*, 507 F.2d 68 (2d Cir.1974) (failure to provide seaworthy vessel not a deviation).

 We agree with our sister circuits that the doctrine of quasi-deviation should not be viewed expansively in the post-COGSA era. Although COGSA did not abolish the doctrine of deviation, the statute's very existence and broad scope obviate the need for an expansive concept of deviation to protect shippers, and the statutory limitation on deviations suggests that courts should construe the doctrine narrowly. See also Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 3–42 at 183 (Foundation Press, 2d ed. 1975) ("It would seem unwise to extend analogically and by way of metaphor a doctrine of doubtful justice under modern conditions, of questionable status under Cogsa, and of highly penal effect."). At all events, in this case we need not decide that quasi-deviations can never encompass more than unauthorized on-deck stowage, as the Second Circuit may have, see *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 31–32 (2d Cir.1986), because SPM's claim would be an unprecedented expansion of the doctrine.

We refuse to declare the intentional restowage of SPM's cargo at an intermediate port a quasi-deviation.[6] Conduct that is customary in the trade is not a deviation from the contractual voyage because such contracts ordinarily presume that the parties will follow the customs and usages of the maritime trade. See, for example, *Caterpillar Overseas, S.A. v. Marine Transport, Inc.*, 900 F.2d 714, 721–22 (4th Cir. 1990) (shift from one terminal to another not unusual, hence not a deviation); *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 17–18 (2d Cir. 1969) (bill of lading presumed to incorporate customs of shipping industry); Sturley, 2A *Benedict on Admiralty* § 122 at 12–12. Here the district court has found that intermediate port restowage is customary, and that finding is not clearly erroneous.[7] Therefore, the district court properly concluded that no quasi-deviation deprived the defendants of their contractual and statutory limits on liability.

## V. EXTENSION OF THE "HIMALAYA CLAUSE" TO MAHER

 SPM seeks to hold the negligent Maher liable in tort for the full amount of damage ($228,000), while Maher claims to

---

**6.** SPM cannot claim that Maher's action was a deviation simply because it was negligent. "[M]ere negligence, lack of due diligence, or a failure to properly handle, care, or deliver cargo never has constituted deviation," *Sedco*, 800 F.2d at 32 (citing *Jones v. The Flying Clipper*, 116 F.Supp. 386 (S.D.N.Y.1953)), nor should it. Quasi-deviations have only been found when the carrier's conduct resulted in a substantial increase in the risk of loss. Deviations are found when an action has "so changed the essence of the agreement as to effect its abrogation." *Jones*, 116 F.Supp. at 389. We agree with the traditional view that a deviation requires more than negligence. The only issue is whether the intentional restowage was a deviation.

**7.** Judge Garth would also hold that the restowage of SHI's cargo was authorized by contract, i.e., Blue Anchor's bill of lading which provided for restowage of cargo at any place, on shore or afloat, and further provided that such restowage was not a deviation. He recognizes that whether a particular act may be deemed a quasi-deviation must be tested by the terms of the parties' contract or by usage and custom. We have unanimously held that the restowage in this instance was found to be customary by the district court and that the district court's finding is not clearly erroneous. In addition, however, as a matter of contract, because there can be no quasi-deviation as long as the carrier acts within the express provisions of its bill of lading, the carrier cannot be guilty of a quasi-deviation.

Thus, in Judge Garth's view, Blue Anchor's bill of lading expressly permitted the restowage of SHI's cargo. It cannot therefore be said that Blue Anchor has deviated from that for which the contract called. Accordingly, Judge Garth would hold that both contract and usage and custom authorized the restowage of SHI's merchandise.

be a third-party beneficiary of a clause in the Yangming bill of lading that confers Yangming's defenses (including the $500 COGSA default limitation) on stevedores. SPM's final contention on appeal is thus that Maher's liability should not have been limited to $500 because Maher was not entitled to any of the liability limitations in the bills of lading.

The Supreme Court has interpreted COGSA to provide for damage limitations for the carrier and the ship, not for stevedores or other third parties involved in the handling of cargo. See *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959). At the same time, however, the Court also suggested that carriers could contractually extend their liability limitation to their employees, agents, and independent contractors, 359 U.S. at 302, 305, 79 S.Ct. at 769, 771, although such provisions, being in derogation of the common law of torts, are to be strictly construed and limited to intended beneficiaries, 359 U.S. at 305, 79 S.Ct. at 771. Carriers now typically include such liability limitation extension clauses in their form contracts, provisions that are generally known as "Himalaya clauses."[8]

The question here is whether Maher was protected by a Himalaya clause. The limitations on Maher's liability are determined under the Yangming bill of lading.[9] Paragraph 3 of that bill reads:

EXEMPTIONS AND IMMUNITIES OF SERVANTS, AGENTS, STEVEDORES, ETC.—In contracting for the following exemptions and limitation of and exoneration from liability, the Carrier is acting as agent and trustee for all other persons named in this clause.

It is understood and agreed that, other than the Carrier, no person, firm or corporation or other legal entity whatsoever (including ... stevedores ...) is, or shall be deemed to be liable with respect to the Goods as carrier, bailee or other whosoever. If, however, it shall be adjudged that any other than the Carrier is carrier or bailee of the Goods or under any responsibility with respect thereto, *all exemptions and limitations of and exoneration from liability provided by law or by terms hereof shall be available to such other.*

It is also agreed that each of these persons and companies referred to above are intended beneficiaries. . . .

(emphasis added).

This provision was rather inartfully drawn, but nevertheless clearly extends all liability limitations in the bill of lading to stevedores, who are expressly denominated intended beneficiaries of the contract. SPM concedes, as it must, that some stevedores are intended beneficiaries. Rather, it argues that Maher was not an intended beneficiary of the contract because it was not performing services in furtherance of the transport of SPM's cargo, but instead was unnecessarily restowing it to make room for unrelated cargo. In SPM's view, the removal and restowage of SPM's cargo at an intermediate port was not a service contemplated in the Yangming bill of lading.

We will assume without deciding that SPM is correct that the Himalaya clause only applies to stevedores' actions taken in furtherance of the contract, rather than, as the district court held, to all actions by all stevedores who handle the cargo for any purpose whatsoever. Even so, we think it plain that Maher's stevedores were handling SPM's cargo in furtherance of the Yangming bill of lading. As noted above, the district court found that restowage of cargo at intermediate ports in order to take on additional cargo is commonplace. SPM has offered us no basis to declare that

**8.** The name apparently comes from an English ship, *The Himalaya*, whose crew a passenger successfully sued because the carriage contract did not have such a limitation clause. See Sturley, 2A *Benedict on Admiralty* § 169 at 16–43 n. 11 (describing *Adler v. Dickson*, [1955] 1 Q.B. 158 (C.A.1954)).

**9.** As the district court ruled, Yangming's liability to SPM is determined under its own bill of lading. The Yangming bill of lading is between Yangming and Blue Anchor, but Blue Anchor was acting as an agent for SHI, the shipper. See *Insurance Co. of North America v. S/S American Argosy*, 732 F.2d 299 (2d Cir.1984). Therefore SHI and Yangming were in contractual privity, and SPM, as consignee, is bound by limitations in the Yangming bill of lading, including any valid Himalaya clause therein.

finding clearly erroneous. We therefore conclude that the Yangming bill of lading contemplated cargo handling by stevedores not only during original loading and .eventual ·final discharge, but also at intermediate ports.

The restowage of SPM's cargo was, according to the district court's findings, typical in that it was done to take on additional cargo and to relocate SPM's cargo to a more convenient location for final discharge. Maher's actions were therefore done in furtherance of the Yangming bill of lading, and, by virtue of the Himalaya clause therein, Maher is entitled to the benefit of the $500 per package damage limitation of COGSA.[10]

## VI. CONCLUSION

We conclude that the district court erred in limiting Blue Anchor's liability to SPM to $500 and should have rendered judgment for $42,800. We also conclude that the district court correctly held that negligent restowage of cargo at an intermediate port is not a deviation that abrogates contractual and statutory limitations on liability, and that Maher is entitled to the benefit of the Himalaya clause in the Yangming bill of lading. Accordingly, the district court

10. SPM relies on the district court decisions in *Cabot Corp. v. S.S. Mormacscan*, 298 F.Supp. 1171 (S.D.N.Y.1969), aff'd, 441 F.2d 476 (2d Cir. 1971), and *Mitsubishi International Corp. v. S.S. Eurymedon*, 1977 A.M.C. 2370 (D.Or.1977) (not otherwise reported), but we find both cases inapposite.

In *Cabot*, the bill of lading defined "carrier" to include "persons rendering services in connection with the performance of the contract." It did not specifically mention stevedores. The defendant stevedore argued that it was, under the bill, a "carrier" entitled to the $500 COGSA limitation that had been contractually imported. The district court noted that the Supreme Court in *Herd* required clear language to extend contractual liability limitations to third parties, and suggested that the quoted phrase might not suffice. That was the ground on which the Second Circuit affirmed. In this case, stevedores are specifically mentioned, so that is no concern.

The district court in *Cabot* went on, however, to hold that the stevedores were rendering services regarding other shippers' goods, because the damage to the plaintiff's goods occurred after those goods were already safely stored in the hold, and while other shippers' goods were being loaded. In this case, the damage oc-

properly limited the liability of Yangming and Maher to SPM to $500. The order of the district court will be affirmed in part and reversed in part, and the case will be remanded for entry of a corrected judgment and for final resolution of Blue Anchor's indemnity claim, as well as other proceedings that have yet to be concluded.

curred while Maher's employees were physically handling SPM's cargo. The district court's holding in *Cabot* is certainly questionable as precedent (the Second Circuit specifically declined to base its affirmance on that ground, and other courts have not followed the district court's reasoning), but is distinguishable in any event.

In *Mitsubishi*, the Himalaya clause exempted stevedores employed in connection with the performance. of the carrier's obligations. Damage occurred to Mitsubishi's cargo when a stevedore at an intermediate port was discharging other cargo and damaged the hold where Mitsubishi's cargo was stored, allowing seawater to enter. The stevedore did not, apparently, handle Mitsubishi's cargo itself, and the district court accordingly found as a fact that the stevedore did not perform any services with respect to Mitsubishi's cargo. The court therefore concluded that the Himalaya clause was no defense to the stevedore's liability.

*Mitsubishi* is factually distinguishable because in this case the intermediate port stevedore *was* restowing the plaintiff's cargo. When such restowage is customary or contractually contemplated, the stevedore acts in furtherance of the carrier's duties. Consequently, the Himalaya clause in the Yangming bill of lading extended the limitations on liability to Maher.