SCHRAMM, INCORPORATED; Atlantic Mutual Insurance Company, Plaintiffs–Appellants,

v.

SHIPCO TRANSPORT, INCORPORATED, In Personam, Defendant–Appellee,

and M/V CASV GUAYA, her engines, tackle, boilers, furniture, apparel, etc., in rem; Compagnie Chileana de Navigancion Interoceanaica; Csav–Chilean Line, Incorporated; Stevedoring Services of America, Defendants.

No. 03–1075.

United States Court of Appeals, Fourth Circuit.

Argued: Jan. 21, 2004.

Decided: April 15, 2004.

**ARGUED:** S. Scott Bluestein, Raley & Bluestein, Charleston, South Carolina, for Appellants. Stephen Peterson Groves, Sr., Nexsen, Pruet, Jacobs, Pollard & Robinson, L.L.C., Charleston, South Carolina, for Appellee. **ON BRIEF:** Bradish J. Waring, Nexsen, Pruet, Jacobs, Pollard & Robinson, L.L.C., Charleston, South Carolina, for Appellee.

Before WILKINSON, MICHAEL, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge MICHAEL and Judge SHEDD joined.

## OPINION

WILKINSON, Circuit Judge:

Appellant Schramm, Inc. contracted with Shipco Transport, Inc. to transport a mobile drilling rig from the Port of Baltimore, Maryland, to the Port of Arica, Chile. When the vessel carrying the rig stopped at an intermediate port in Charleston, South Carolina, the ship's master ordered for security reasons that the rig be offloaded so that it could be restowed on a lower deck. While the rig was dockside during the course of restowage, it was severely damaged. The district court found that Shipco was liable for the damage, but it limited appellants' recovery to $500 pursuant to the Carriage of Goods by Sea Act ("COGSA"). *See* 46 U.S.C. app. § 1304(5) (2000).

We affirm. COGSA's liability limitation continued to apply when the cargo was being restowed at Charleston. Even though the rig was damaged while on land, the restowage operation at the intermediate Charleston port was a customary activity in the carriage of goods at sea and did not constitute a "discharge" from the vessel under COGSA. In addition, the parties' bill of lading did not otherwise limit COGSA's applicability.

### I.

In October 1999, Schramm sold a mobile drilling rig to Perforaciones San Rafael S.R.L. of Cochabamba, Bolivia. The drilling rig consisted of a large drill and the truck on which it was mounted. The total cost of the rig was $160,725.42, which included freight and insurance charges.

Schramm arranged to have Shipco transport the rig from the Port of Baltimore, Maryland, to the Port of Arica, Chile, via an ocean-going vessel. Shipco is a "non-vessel-operating common carrier," which is "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier." 46 U.S.C. app. § 1702(17)(B). Thus, Shipco never actually handles the cargo, but instead subcontracts with other parties to carry the cargo and deliver it to its destination. Here, Shipco contracted with the owner of the M/V CSAV GUAYAS to transport the rig from the United States to Chile.

Shipco issued a clean bill of lading to Schramm to cover transport of the rig. The bill of lading designates Schramm as the "Shipper" and Shipco as the "Carrier." In a paragraph entitled "Package or Shipping Unit Limitation," the parties agreed that Shipco's liability was limited to $500 per package wherever COGSA was applicable, "unless a declared value has been noted" by the parties. A space was provided on the front of the bill of lading for "Shippers Declared Value," where Schramm was entitled to avoid COGSA's liability limitation of $500 and declare the value of its goods in order to receive greater protection. However, Schramm left this space blank, and it obtained independent cargo insurance from appellant Atlantic Mutual Insurance Company.

The rig, secured on a flat rack container with a bottom and two sides, was loaded

onto the vessel M/V CSAV GUAYAS in Baltimore on October 21, 1999. While en route to Chile, the vessel stopped at an intermediate port in Charleston, South Carolina. There, on October 22, 1999, the vessel's operator ordered the rig offloaded so that it could be restowed on a lower deck of the vessel. The vessel's master wanted the rig and one other container to be restowed under deck to avoid pilferage of the goods at subsequent ports and damage to them during the voyage. The master retained Stevedoring Services of America ("SSA") to handle the offloading, transportation, storage, and reloading of the rig in Charleston. SSA offloaded the rig, still attached to its flat rack container, and placed it on a chassis for dock-side transport. While it was being moved, the rig fell over onto the concrete dock and was damaged beyond repair. It was later declared a total loss by marine inspectors.

Pursuant to its insurance obligations, Atlantic Mutual paid Perforaciones San Rafael S.R.L. the purchase price and related costs, on Schramm's behalf. Then, on October 20, 2000, Schramm and Atlantic Mutual filed suit against Shipco, among other parties, to recover breach of contract damages from the destruction of the rig. They claimed losses in excess of $176,797.96, which represented the amount that Atlantic Mutual paid to Perforaciones San Rafael S.R.L.

Shipco filed for partial summary judgment, claiming that its liability was limited to $500 either by COGSA or by the contractual bill of lading. At first, the district court denied Shipco's motion. It held that COGSA did not apply to the period of time during which the rig was destroyed—while

the rig was being transported on land in Charleston and was not "hooked up" to the vessel. Moreover, the court held that the bill of lading did not extend COGSA beyond this limited period except where the goods were in the "actual custody" of Shipco.

Upon reflection, however, the district court granted Shipco's Rule 59(e) motion for reconsideration and concluded that COGSA did indeed apply to the period of time during which the rig was destroyed. It held that the "tackle-to-tackle" application of COGSA covers goods from the port of loading until the final port of destination, and that COGSA thus applies during restowage of cargo at intermediate ports regardless of whether damage occurs while goods are on land or aboard the vessel. Moreover, the district court held that the bill of lading did not limit COGSA's application. The court thus granted appellants' motion for summary judgment against Shipco on the question of liability and granted Shipco's motion to limit its liability to $500. Appellants now challenge the district court's decision to limit Shipco's liability under COGSA.[1]

## II.

COGSA governs "every bill of lading ... which is evidence of a contract for the carriage of goods by sea to or from ports of the United States [and] in foreign trade." 46 U.S.C. app. § 1300. And the statute provides a default limitation of liability for carriers:

> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with

---

1. In addition, appellants contend that the district court abused its discretion in granting Shipco's Rule 59(e) motion for reconsideration and in declining to award pre-judgment interest to Schramm. In our view, the district court was within its discretion to correct its previous error of law and to rule that COGSA limited Shipco's liability to $500, as we conclude here. *See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 402–03 (4th Cir.1998). The district court also did not err in declining to award prejudgment interest.

the transportation of goods in an amount exceeding $500 per package ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

*Id.* § 1304(5). Here, there is no question that Schramm left blank the space in the bill of lading for declaring a higher value on its goods. It thus accepted COGSA's limitation of liability, which was incorporated into the bill of lading, and chose to obtain independent cargo insurance from Atlantic Mutual. Consequently, if we find that COGSA applied at the time the rig was damaged, then Shipco's liability is properly limited to $500 under § 1304(5).

By its terms, COGSA covers "the period from the time when the goods are loaded on to the time when they are discharged from the ship." *Id.* § 1301(e). This period has been referred to as "tackle to tackle." *See, e.g., Mannesman Demag Corp. v. M/V Concert Express,* 225 F.3d 587, 589 (5th Cir.2000); *B. Elliott (Can.) Ltd. v. John T. Clark & Son of Md., Inc.,* 542 F.Supp. 1367, 1372 (D.Md.1982). The basic question, then, is whether the drilling rig was "discharged" from the vessel, within the meaning of the term in COGSA, at the time it was damaged. Appellants contend that the rig was in fact discharged because it was damaged not on the vessel, but on land. However, this does not automatically mean that COGSA's provisions are inapplicable. When the rig was damaged, it was not unloaded onto the dock at its final port of destination. Rather, for security reasons it was being temporarily offloaded from the vessel and transported dockside by a stevedore at an intermediate port of call in Charleston. The sole purpose for the temporary offloading of the rig onto the dock was to restow it below deck. Appellants have pointed us to no decisions that have found such restowage operations at intermediate ports to fall outside the scope of COGSA.

■ The statutory text does not permit the view that restowage of the rig constituted a "discharge" under COGSA. COGSA does not itself define the term "discharge." When viewing the statute as a whole, however, it is clear that goods are not "discharged" from a vessel under COGSA until they are released from the ship at the final port of destination, and thus that the restowage of goods at an intermediate port does not constitute a discharge. For example, COGSA provides that a carrier must "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. app. § 1303(2); *see also id.* § 1302 (extending a carrier's responsibilities, as well as its rights and immunities, to the "loading, handling, stowage, carriage, custody, care, and discharge" of goods). This sweeping statement of a carrier's duties when transporting goods by sea easily includes the restowage of goods at an intermediate port. For one thing, its specifies that COGSA applies to stowage activities. And the carrier's duty to handle and care for the goods it transports readily encompasses the decision to restow cargo based on security concerns.

In fact, the very notion of the "carriage of goods by sea," as the statute is titled, suggests a comprehensive coverage that includes customary activities like intermediate port restowage. It would be awkward, given COGSA's scope, if each restowage of goods at an intermediate port would create a distinct period of time during which COGSA was temporarily inapplicable. The most reasonable interpretation of the statute is rather that a discharge of goods occurs under COGSA when the goods are removed from the ship at the final port of destination.

Moreover, this construction of COGSA is sensible in light of the complementary frameworks provided by COGSA and the

Harter Act. The Harter Act also governs the common carriage of goods by sea, but unlike COGSA it contains no default limitation of liability. Appellants therefore want us to find that the Harter Act applied when the rig was damaged. The Harter Act, which was superseded in large part by COGSA, still applies "prior to the time when the goods are loaded on or after the time they are discharged from the ship," 46 U.S.C. app. § 1311, and its application extends until "proper delivery," *id.* § 190. *See Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734, 738–39, 741–42 (4th Cir.1993); *B. Elliott (Can.) Ltd. v. John T. Clark & Son of Md., Inc.*, 704 F.2d 1305, 1307 (4th Cir.1983).

■■ Courts have consistently outlined the periods in which COGSA and the Harter Act each apply by default as follows: the Harter Act applies prior to loading, COGSA applies from the loading of goods until the discharge of the goods from the vessel, and the Harter Act then applies from discharge until the goods are delivered to the consignee. *See, e.g., Mannesman Demag Corp.*, 225 F.3d at 592; *Wemhoener Pressen*, 5 F.3d at 738–39, 740; *B. Elliott*, 704 F.2d at 1307; *Caterpillar Overseas, S.A. v. S.S. Expeditor*, 318 F.2d 720, 722–23 (2d Cir.1963). The "discharge" of goods from a vessel thus marks the transition of coverage from COGSA to the Harter Act, unless the parties have agreed to extend COGSA, and the Harter Act then applies until delivery is made.

This successive scheme of coverage suggests that the point of discharge under COGSA is *not* every time the goods are taken off the vessel—such as for restowage—but rather the discharge of goods at their final port of destination, where delivery can be made. Indeed, COGSA itself associates the point of discharge and the point of delivery in this way. For instance, COGSA states that notice about damage to cargo must be given a carrier by a consignee "at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage." 46 U.S.C. app. § 1303(6). This provision further suggests that a discharge under COGSA refers to release of the cargo at the destination port. And courts have uniformly used the term "discharge" in this natural sense. *See, e.g., SPM Corp. v. M/V Ming Moon*, 965 F.2d 1297, 1300 (3d Cir.1992) (holding that "discharge" under COGSA means removal of the goods at their final port of destination); *Philip Morris v. Am. Shipping Co.*, 748 F.2d 563, 566–67 (11th Cir.1984)(using the term "discharge" to refer to removal of goods at the destination port); *B. Elliott*, 704 F.2d at 1308 (noting that "the damage to the cargo occurred one day after discharge but prior to delivery"); *Pan Am. World Airways, Inc. v. Cal. Stevedore and Ballast Co.*, 559 F.2d 1173, 1177 n. 5 (9th Cir.1977) (stating that "COGSA has been continuously interpreted as being applicable from the time the ship's tackle is hooked onto the cargo at the port of loading until the time when cargo is released from the tackle at the port of discharge.").

Our construction of COGSA also comports with the realities of maritime practice. The maritime trade changed considerably with the advent of containerized shipping. *See* Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* §§ 1–5, 3–24 (2d. ed.1975). Cargo is now secured to large, standardized containers, as was the drilling rig in this case. This "container revolution" allowed for combined transport of goods between different modes of transportation, and it also enabled ocean-going carriers to organize and reorganize cargo more easily than before. *See id.* It has thus led to more frequent restowage of goods at intermediate ports, which is reflected by the findings of some courts that the restowage of goods at in-

termediate ports is a customary activity in the maritime trade. *See, e.g., Ming Moon,* 965 F.2d at 1304; *Great Am. Ins. Cos. v. M/V Romeral,* 934 F.Supp. 744, 747–48 (E.D.La.1996); *Anyangwe v. Nedlloyd Lines,* 909 F.Supp. 315, 320–21 (D.Md. 1995). Given the breadth of COGSA's application, we find it reasonable to consider accepted occurrences like restowage of cargo at intermediate ports as falling within the statute's purview.

▮▮▮ In sum, we hold that the term "discharge" under COGSA "means the removal of the goods at their final port of destination, and hence COGSA also cover[s] the temporary unloading" of goods at an intermediate port. *Ming Moon,* 965 F.2d at 1300. However, our holding is by no means open-ended. COGSA can apply to goods transported by sea but damaged on land, but there must be a sufficient nexus between the activity which caused damage to the goods and the carriage of goods by sea. This would be an altogether different case if the cargo was damaged in circumstances far removed from customary maritime activities. On the facts of this case, we find that appellants' drilling rig had not been "discharged" from the vessel under COGSA when it was damaged during restowage at the intermediate Charleston port, and therefore that Shipco's liability was properly limited to $500.

### III.

▮▮▮ Appellants also appear to argue that, even if COGSA would typically apply during restowage of cargo at intermediate ports, the bill of lading here rendered COGSA inapplicable to this case. The contract's "Clause Paramount," after expressly incorporating COGSA's provisions, states that COGSA "shall also govern before the Goods are loaded on and after they are discharged from the Vessel and throughout the entire time the Goods are in the actual custody of the Carrier or Participating Carrier." According to appellants, since the rig was damaged while being handled by SSA—not Shipco—Shipco cannot limit its liability pursuant to COGSA.

Appellants have this point exactly backwards. As a non-vessel-operating common carrier, Shipco never has actual control over the goods, but the cargo was indisputably in its legal custody for the duration of the voyage. Moreover, as the district court observed, the fundamental purpose of the Clause Paramount was not to restrict COGSA but to extend it beyond its normal application: both before the drilling rig was loaded onto the vessel and after it was unloaded from the vessel. Parties to a bill of lading are entitled to contract for extensions of COGSA beyond its customary scope, and specifically to the periods "prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea." 46 U.S.C. app. § 1307; *see also B. Elliott,* 704 F.2d at 1307. That this was the purpose of the Clause Paramount is clear from the language of the provision itself, which states that COGSA "shall *also* govern" these periods. Given that the Clause Paramount thus is meant to *extend* COGSA's protections, we certainly will not construe it to *limit* the statute's normal application.[2]

---

**2.** Shipco also argues that, in the event that COGSA does not limit its liability either by its own force or by contractual extension, a "savings clause" in the bill of lading establishes a $500 limitation of liability. This clause states that "if no limitation amount is applicable under either of the Rules [such as COGSA] or legislation the limitation shall be U.S. $500." The district court did not address this claim because it found that COGSA limited Shipco's liability. Because the district court did not fully consider the issue and because we affirm the court on other grounds, we need not resolve the savings clause contention here.

## IV.

The district court was therefore correct to limit Shipco's liability to appellants to $500. It is worth emphasizing that our decision today deals with the *default* limitation of liability established by COGSA. Schramm was surely entitled to opt for more liability coverage in the bill of lading. There is no argument here that Schramm was unaware of its ability to declare a higher value of coverage. Instead, Schramm accepted the COGSA limitation and insured its cargo with Atlantic Mutual. We will not relieve appellants of the consequences of this decision through strained statutory and contractual interpretation. The judgment of the district court is

*AFFIRMED.*