**GENERAL ELECTRIC COMPANY, et al.**

v.

**INTER–OCEAN SHIPPING, et al.**

Civ. A. No. H–93–165.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 29, 1994.

Gus A. Schill, Royston Rayzor Vickery & Williams, Houston, TX, for plaintiff Gen. Elec. Co.

R.M. Sharpe, Jr., Sharpe & Kajander, Houston, TX, for plaintiff Stephen R. Bishop & Ors, As Representative Leading Underwriter For and On Behalf Of Those Certain Subrogated Underwriters At Lloyd's London and in the London Co. Market.

Derek A. Walker, Chaffe McCall Phillips Toler & Sarpy, New Orleans, LA, for defendant Inter–Ocean Shipping C.A.

Hubert Oxford, III, Benckenstein, Oxford & Johnson, Beaumont, TX, for defendants Brown & Root Inc., Brown & Root Inc. dba Joe D. Hughes Inc.

Jack Lee Allbritton, Fulbright & Jaworski, Houston, TX, for defendant London Offshore Consultants, Inc.

OPINION ON TIME AND PACKAGE LIMITATIONS

HUGHES, District Judge.

1. *Introduction.*

This maritime case requires the application of the statute of limitations to the port captain and the application of package limit rules to the port captain and the stevedore.

2. *Background.*

The M.V. *Diana* was owned and operated by Inter–Ocean Shipping. Inter–Ocean agreed with General Electric and Halliburton to carry their cargo from Houston to El Tablazo, Venezuela. Inter–Ocean hired Brown & Root to load the cargo and London Offshore Consultants to supervise the stowage of the cargo. London Offshore was responsible for stability. The *Diana*, essentially configured as a supply boat, only had cargo stowage on the weather deck.

General Electric's cargo was covered by a single bill of lading. Halliburton's cargo was covered by three bills of lading. The only difference among the bills is that the faces of all three of Halliburton's bills were marked "cargo loaded on deck," while General Electric's bill of lading was not.

The *Diana* capsized in the Gulf of Mexico losing all its cargo and eight of the eleven crew. This is about the cargo only. General Electric and the insurers that are subrogated to Halliburton sued Inter–Ocean and Brown & Root on the anniversary of the sinking.

While this suit was abated for resolution of a limitation of liability action, substantive discovery began in the state court suit over the deaths of the crew. On January 19, 1994, the plaintiffs in this suit added London Offshore as a defendant.

### 3. *Claims.*

Both London Offshore and Brown & Root claim that federal maritime law extends special protection to them. *See* The Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. §§ 1300–1315 (1987). London Offshore asserts that COGSA's statute of limitations applies, and both argue that COGSA's limit of liability to $500 per package or customary freight unit applies.

### 4. *COGSA and the Bills of Lading.*

██ The contract of carriage between a carrier and the shipper is usually merely the bill of lading. COGSA may apply to the cargo either by operation of law (*ex proprio vigore* ) or by the bills of lading incorporating it.

> Every bill of lading ... for carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect to the provisions of this Act.

46 U.S.C.App. § 1300. The act excludes from its definition of goods "cargo which by the contract of carriage is stated as being on deck and is so carried." 46 U.S.C.App. § 1301(c). By its own terms COGSA does not apply to on-deck stowage when that stowage is disclosed. Since the General Electric bill of lading did not reveal on its face that the stowage was on deck, the exclusion does not apply, and COGSA affects that bill of lading by its own force. *See Sail America Foundation v. M.V.T.S. Prosperity,* 778 F.Supp. 1282 (S.D.N.Y.1991).

██ Parties may incorporate COGSA in their agreement when it does not apply of its own force. 46 U.S.C.App. § 1312. For example, COGSA has been made to apply to on-deck storage between United States ports. *See Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co.,* 155 F.2d 687 (5th Cir.), *cert. denied,* 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946). The back of these three bills have three clauses that, when taken together, incorporate COGSA.

The general paramount clause applies the Hague Rules in the International Convention for the unification of certain rules about bills of lading *as enacted in the country of shipment. See* Bills of Lading ¶ 2. COGSA is the enactment of the Hague Rules in the United States. *See Robert C. Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959).

The second relevant paragraph specifically addresses deck cargo, goods to which COGSA by its own terms does not apply. The clause specifies that on-deck coverage is carried subject to the Hague Rules even though the Hague Rules would not ordinarily apply. *See* Bills of Lading ¶ 9.

The third relevant paragraph states that if COGSA applies, then it applies from before loading until after discharge and throughout the entire time that the goods are in the carrier's custody. *See* Bills of Lading at Additional ¶ B.

The cumulative effect of the three clauses is the application of COGSA to the bills of lading. It is true that standing alone, the last paragraph would not incorporate COGSA. *See Couthino, Caro, and Co. v. M.V. Sava,* 849 F.2d 166, 170 (5th Cir.1988). The other two clauses, however, are explicit statements of COGSA's applicability.

All of the parties in this voyage knew that on-deck storage was the only kind the *Diana* offered. COGSA applies where the shipper had actual notice of on-deck storage or consent can be imputed from an established custom. *See Seguros Banvenez, S.A. v. S.S. Oliver Drescher,* 761 F.2d 855, 859 (2d Cir. 1985). General Electric had previously shipped the transformer at issue in this case aboard the *Diana.* On-deck stowage is not a deviation from the vessel's expected mode of transportation. Deviations must be unreasonable to affect liabilities. This cargo was required to be carried on-deck. *See DuPont v. S.S. Mormacvega,* 367 F.Supp. 793 (S.D.N.Y.1972).

5. *Notice.*

■ Incorporation of COGSA by the bills of lading is effective only if the shipper has notice that it applies and, for the $500 limit on liability, an opportunity to declare an excess value. The face of each bill contains a box for "freight details, charges, etc." There was ample space for the shipper to declare a cargo value in excess of $500. The shippers chose not to declare a value. Testimony by a Halliburton official also reinforces the absence of dispute that both Halliburton and General Electric understood that they were assuming the risk of loss beyond the $500 limit by not declaring an excess value.

6. *The Bills and Contractors.*

■ The bills of lading contain what is commonly referred to as a Himalaya clause. Himalaya clauses extend the rights and protection contained in bills of lading to independent contractors and agents of the carrier. *See Brown & Root, Inc. v. M.V. Peisander,* 648 F.2d 415 (5th Cir.1981). The Himalaya clause in these bills of lading is broadly worded.

> [N]o servant or agent of the Carrier (including every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Merchant.... [E]very right, exemption from liability, defense and immunity of whatsoever nature applicable to the Carrier ... shall also be available and shall extend to protect every such servant or agent of the Carrier....

Bills of Lading ¶ 18.

■ The plaintiffs argue that coverage of the specific defense must be expressly stated in the bill for an independent contractor to take advantage of the Himalaya clause. The clause precisely says that all the carrier's defenses are extended to independent contractors. There is no requirement that the intended beneficiaries of the Himalaya clause be specifically mentioned or that the particular right of the carrier must be expressed. *See Taisho Marine & Fire Ins. Co.,* 796 F.Supp. 336 (N.D.Ill.1992). Further, the two defenses at issue, $500 limit and one-year statute of limitation, are common defenses,

known to all shippers. The clause put the plaintiffs on notice that all independent contractors connected with the voyage held the same rights and defenses that the carriers did.

■ General language is sufficient to extend defenses under the bill of lading to stevedores. *See Secrest Machine Corp. v. S.S. Tiber,* 450 F.2d 285 (5th Cir.1971). Even marine terminal operators have been extended protection under a general clause. *See Wemhoener Pressen v. Ceres Marine Terminals,* 5 F.3d 734 (4th Cir.1993). Both London Offshore and Brown & Root are directly and substantially connected with the voyage to be reasonably understood that they would come under this clause by a shipper.

7. *Statute of Limitations.*

■ COGSA mandates that all suits be brought within one year of the incident. 46 U.S.C.App. § 1303(6). London Offshore was not sued until almost two years had passed since the *Diana* was lost. General Electric argues that maritime laches allows this court to apply, as a guideline, the two year statute of limitations under Texas law for conversions. *See Mecom v. Levingston Shipbuilding Co.,* 622 F.2d 1209, 1215 (5th Cir.1980). General Electric argues that it did not appreciate London Offshore's role in the stowage of the cargo until depositions were taken in the state case.

The certainty and finality of the one-year limit would be eliminated if federal courts sitting in admiralty routinely extended the period based on state-law standards. *See Mikinberg v. Baltic S.S. Co.,* 988 F.2d 327 (2d Cir.1993). The one-year period was more than enough time for the plaintiffs to find out who participated in the cargo handling. London Offshore, as the port captain, should have been a prime suspect from the beginning. The filing of the original suit on the one-year anniversary of the accident reflects the parties' recognition of and response to the one-year statute of limitation. General Electric has presented no evidence that it was misled or prevented from discovering London Offshore's role within the time limit.

Also, London Offshore has been prejudiced by not participating in the depositions that have taken place, including the depositions of the vessel's owner and surviving crew. General Electric will take nothing from London Offshore.

8. *Package Limit.*

Neither the carrier nor the ship shall ... become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ... or in the case of goods not shipped in packages, per customary freight unit, ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C.App. § 1304(5).

Conceptually there are four different ways that cargo can be classified: (a) a single package, (b) many packages in a container, (c) a customary freight unit in itself, or (d) an object made up of customary freight units. Since the $500 limit applies to each customary freight unit, if the entire object is itself a customary freight unit, like a tractor, the limit is $500. If the shipping price of the object is determined by its weight or volume, however, the $500 is multiplied by the number of customary freight units making up the object. For many cargoes, the customary unit is a measurement ton, which essentially was the average space occupied by one ton of cargo. *See, e.g., Tamini v. M.V. Jewon,* 699 F.Supp. 105, 107 (S.D.Tex.1988), *aff'd sub nom., Tamini v. Salen Dry Cargo AB,* 866 F.2d 741 (5th Cir.1989).

The determination of where a particular cargo fits into the statutory scheme is muddled. Courts have found a container holding many packages to be limited to $500 because the bill of lading referred to the container as a package and specified the container as a freight unit. Other courts generally apply the $500 limitation to each package in a container no matter how the bill of lading reads. *Compare D.W.E. Corp. v. T.F.L. "Freedom,"* 704 F.Supp. 380 (S.D.N.Y.1989) *with Universal Leaf Tobacco Co. v. Companhia de Navegacao Maritima Netumar,* 993 F.2d 414 (4th Cir.1993).

Examination of shipping documents to determine the intent of the parties about what they meant to constitute a package is poor, but it is the best that can be done. *See Seguros Illimani S.A. v. M.V. POPI P,* 929 F.2d 89 (2d Cir.1991); *Allstate Ins. Co. v. Inversiones Navieras Imparca,* 646 F.2d 169 (5th Cir.1981). This often is fruitless with unusual units of cargo. It is instructive that almost every test devised by a court has been disagreed with by another court. *See, e.g., Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d 807 (2d Cir.1981), *disagreed with, Hayes–Leger Assoc., Inc. v. M.V. Oriental Knight,* 765 F.2d 1076 (11th Cir.1985) (disagreement over the "functional economics" test).

In this case, Halliburton's cargo consisted of one "box" of computer equipment, 48 "packages" of oil field and related equipment, and one truck. General Electric's cargo consisted of one electrical transformer and seven "packages" of transformer parts.

■ The only items at issue are the truck and the transformer. The other "packages" are agreed to be the type of packages conceived of by the statute. Because the bills of lading do not specify dollar amounts for each package, the value of the goods in them was not declared to the carrier, and the $500 limit per package applies.

■ Unboxed motor vehicles are customary freight units in themselves. *See Aetna Ins. v. M.V. Lash Italia,* 858 F.2d 190 (4th Cir.1988); *FMC Corp. v. Marjorie Lykes,* 851 F.2d 78 (2d Cir.1988). The Halliburton truck is subject to the $500 limit.

The court cannot determine from information in the record about the transformer whether by its appearance its value was apparent to the carrier, to keep it from being considered a customary freight unit. A few observations may assist the parties in obtaining the evidence.

■ Because payment for shipping the transformer was not expressly quoted by weight or volume, there cannot be a customary freight unit of measurement that applies to it. Assuming that it was (a) not packaged, (b) obviously of exceptional value, and (c) was

exposed to plain view, it will not be a package. *See Aggreko, Inc. v. LEP Int'l, Ltd.,* 780 F.Supp. 429, 431 (S.D.Tex.1991), *aff'd,* 990 F.2d 627 (5th Cir.1993). If true, these conclusions leave two possibilities: Either the transformer itself is a customary freight unit, analogous to a truck, or it was notice of its value in itself and the limit does not apply.

9. *Conclusion.*

The uniformity that is implicit in the $500 limit allows a whole industry to function with standard procedures. Cargoes are dealt with by parties far removed from knowledge of the nature and context of the shipment except as it is clearly reflected in the shipping documents. To require stevedores, connecting carriers, surveyors, port captains, and all of the others who may have to work with a cargo to guess at its uniqueness and value is unrealistic. A rule that expands the exceptions to the limit will have the effect of visiting occasionally high costs on the carriers, their contractors, and insurers. The insurers will respond by raising rates for cargo more than enough to cover the actual long-run cost because the costs will be widely unpredictable. The carriers can hire sophisticated inspectors to evaluate cargo as it is loaded to detect exceptional and obvious value. Imposing either of these costs because the shipper failed to indicate on the documents that it valued the cargo at a higher rate than the statutory standard is simply wasteful. The rigor of the $500 limit should be promoted.

In the meantime, the law as it is will be applied to the facts of the transformer as they turn out to be.

### ORDER

1. General Electric and Stephen R. Bishop & Ors take nothing from London Off-shore Consultants, Incorporated. (# 34)

2. All cargo on board the M.V. *Diana* is subject to the statutory $500 limit, except General Electric's electrical transformer. (# 39)

3. Brown & Root's motion for summary judgment applying the package limit to

the transformer is denied without prejudice. (# 39)