YANG MACHINE TOOL CO.,
Plaintiff–Appellee,

v.

SEA-LAND SERVICE, INC.,
Defendant–Appellant.

No. 93–17311.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 15, 1994.

Withdrawn from submission Dec. 20, 1994.

Resubmitted March 16, 1995.

Memorandum Filed March 20, 1995.

Order and Opinion Filed June 30, 1995.

James J. Tamulski, Kaye, Rose, Tamulski & Maltzman, San Francisco, CA, for defendant-appellant.

Robert C. Chiles, Long & Levit, San Francisco, CA, for plaintiff-appellee.

Before: FARRIS, BOOCHEVER, and BRUNETTI, Circuit Judges.

## ORDER

The memorandum disposition filed March 20, 1995, is redesignated as an authored opinion by Judge Boochever.

## OPINION

BOOCHEVER, Circuit Judge:

Yang Machine Tool Company ("Yang Machine") contracted with Sea–Land Service, Inc. ("Sea–Land") to transport two cases of oversized cargo from China to California. The cargo was damaged while being restowed onto a substitute vessel in Japan, and Yang Machine sued for recovery of damages. The district court found that the restowage of the cargo onto the substitute vessel constituted an "unreasonable deviation," and the court granted Yang Machine's motion for summary judgment. Sea–Land appeals the judgment and seeks to limit its liability to $500 per package under 46 U.S.C.App. § 1304(5). We reverse and remand the case to enter judgment for Yang Machine in the amount of $1,000.

### FACTUAL AND PROCEDURAL BACKGROUND

Sea–Land is an ocean carrier that regularly carries goods from ports in Asia to the United States. Yang Machine contracted with Sea–Land to transport a large horizontal machining center from China to California. Yang Machine had shipped cargo with Sea–Land over 100 times prior to this particular shipment.

Because the machinery was considered "oversize," as it would not fit in a standard 40' enclosed container, it was shipped in two parts on a "flat rack," a metal pallet with no sides or top. The cargo was secured on the flat rack by steel bands and placed on board the vessel MERCHANT PRINCE. The MERCHANT PRINCE carried the cargo from China to Yokohama, Japan. There the cargo was off-loaded and restowed onto the vessel SEALAND PATRIOT for carriage to California. While the cargo was being reloaded onto the SEALAND PATRIOT, a hoisting cable broke and the cargo was damaged. The shipment was insured, and Yang Machine received payment from its insurance company.

The bill of lading issued by Sea–Land identified only the MERCHANT PRINCE as the carrying vessel. It did not indicate that the cargo would be restowed aboard the SEALAND PATRIOT. Therefore, Yang Machine contends it was led to believe that the MERCHANT PRINCE would sail through to California and the cargo would remain on board that vessel. The bill of lading contained a provision, however, that reserved Sea–Land's right to use other vessels: "Carrier shall have the right, without notice, to substitute or employ a vessel, watercraft, or other means rather than the vessel named herein to perform all or part of the carriage."

The bill of lading also contained a provision which limited Sea–Land's liability to $500 per

package of cargo, unless the shipper declared in the space provided on the face of the bill of lading a higher value for the goods. Yang Machine, however, did not declare a higher value for the cargo.

Yang Machine brought suit against Sea–Land for the damage to its cargo. Yang Machine filed a motion for summary judgment seeking $241,700 in damages. Sea–Land filed a cross-motion for summary judgment by which it sought to limit its liability to $1,000 ($500 per package) as authorized by the contract and by 46 U.S.C.App. § 1304(5). The district court found that Sea–Land had committed an unreasonable deviation by restowing the cargo onto the SEALAND PATRIOT and granted Yang Machine's motion for summary judgment, thereby depriving Sea–Land of the $500–per–package limitation. Because there was some confusion over the amount of damages, the parties stipulated to damages in the amount of $200,000, and the district court entered a judgment to that effect. Sea–Land now appeals.

### STANDARD OF REVIEW

■ A grant of summary judgment is reviewed de novo. Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). The parties agreed that there were no issues of material fact.

### DISCUSSION

I. *No Deviation from the Contract of Carriage*

■ The Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300–1315, ap-

plies to all international cargo shipments which are carried by sea, to or from the United States. COGSA allows carriers to limit their liability to $500 per package of cargo in the event of loss or damage to the cargo. 46 U.S.C.App. § 1304(5).[1] An exception to this limitation applies, however, if the carrier commits an unreasonable deviation from the contract of carriage. *See Nemeth v. General S.S. Corp., Ltd.*, 694 F.2d 609, 613 (9th Cir.1982). A deviation is "a 'serious departure from the contract of carriage,' exposing the cargo to 'unanticipated and additional risks.' " *Id.* (citations omitted).

■ The district court in this case found that Sea–Land's "transshipment" of the cargo, i.e., unloading the machinery from the MERCHANT PRINCE and restowing it onto the SEALAND PATRIOT, constituted a deviation. Sea–Land argues, however, that the transshipment was not a deviation for three reasons: (1) the bill of lading gave notice of Sea–Land's right to use substitute vessels; (2) most courts limit the doctrine of deviation solely to geographic deviations and unauthorized on-deck stowage; and (3) the unadvertised use of substitute vessels is customary in the trade. Because we find that the contract of carriage, or bill of lading, provided notice of Sea–Land's right to use substitute vessels, we conclude that there was no deviation from the contract of carriage. We need not reach Sea–Land's other two arguments.

Clause 3 in the bill of lading provided: "Carrier shall have the right, without notice, to substitute or employ a vessel, watercraft, or other means rather than the vessel named herein to perform all or part of the carriage." The district court stated, however, that no-

---

1. 46 U.S.C.App. § 1304(5) states:

    Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embod-

ied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

    By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided*, That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained....

tice of Sea–Land's right to transship was not contained in the bill of lading.

Sea–Land presented evidence that other ocean carriers used similar clauses in their bills of lading to notify shippers of the carriers' right to use substitute vessels. Specifically, the bills of lading for three other major carriers, American President Lines, Evergreen Line, and Maersk Shipping, all contained clauses which reserved the right.[2] The district court found that these carriers' bills of lading provided adequate notice but that Sea–Land's did not. The court noted, "It would be extremely easy for [Sea–Land] to do what some of the other carriers do, namely, include notice in their bills of lading that during the course of shipment they may transship the goods or use feeder vessels or information that the cargo will be on another vessel during part of its journey."

Sea–Land's bill of lading, however, did provide notice of the right to employ substitute vessels. Clause 3, although not using the word "transshipment," was similar to the provisions found in the bills of lading of the other major carriers which the district court found provided adequate notice. Moreover, Sea–Land's bill of lading provided for the right to use substitute vessels "to perform all or *part* of the carriage" (emphasis added). Use of a substitute vessel for part of the voyage necessarily encompasses a transshipment. Accordingly, we hold the transshipment was not a deviation from the contract of carriage.

Yang Machine argues, however, that the clause in the bill of lading which reserves the right to use substitute vessels is part of a broad "liberty clause" which is essentially unenforceable because it purports to give the carrier absolute freedom in the manner, method, and mode of transport.[3] Yang Machine contends that if this clause were taken literally, there would be no doctrine of deviation because anything the carrier did would be part of the "contract" voyage, as defined by the broad liberty clause. *See* 2A *Benedict on Admiralty* § 125, at 12–29 (1994).

■ Liberty clauses have been construed strictly to allow only reasonable deviations. They are unenforceable to the extent they authorize unreasonable deviations. *See Berkshire Fashions, Inc. v. M.V. Hakusan II,* 954 F.2d 874, 885 (3d Cir.1992); *General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 84 (2d Cir.1983), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

Sea–Land maintains that only the first paragraph of Clause 3 in its bill of lading contains the typical liberty clause and that the second paragraph, which reserves the right to transship, should not be considered part of the liberty clause. Cases dealing with the effect of liberty clauses, however, have referred to clauses which reserve the right to transship as liberty clauses. *See, e.g., Berkshire Fashions,* 954 F.2d at 878. The "typical" liberty clause, however, generally contains only the language found in the

**2.** Clause 11 of American President Lines' bill of lading states:

... Carrier may, without notice, transship the whole or any part of the Goods before or after loading at the original port of shipment ... by any substituted or connecting water carrier's vessel.

.     .     .     .     .

Clause 20 of Evergreen Line's bill of lading, and Clause 17.1 of Maersk Line's bill of lading state:

... Carrier may at any time and without notice ... b) transfer the Goods from one conveyance to another including transshipping or carrying the same on another vessel than the vessel named overleaf....

**3.** The full text of Clause 3 of the bill of lading provides:

The voyage herein contracted for shall include ports in or out of the advertised, geographical, usual or ordinary route or order.

The vessel may omit calling at any port or ports whether scheduled or not, and may call at the same port more than once; may before or after proceeding toward the port of discharge, make trial trips or tests, take fuel or stores at any port in or out of the regular course of the voyage, sail with or without pilots, tow and be towed, and save or attempt to save life, vessels in distress or other property; and all of the foregoing are included in the contract voyage.

Carrier shall have the right, without notice, to substitute or employ a vessel, watercraft, or other means rather than the vessel named herein to perform all or part of the carriage. When the port of destination or discharge is not served by Carrier's containership, Carrier may, at any intermediate port, break bulk of cargo shipped in containers.

first paragraph of Clause 3. *See* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* 138 n. 3 (2d ed. 1994).

We find that Sea–Land was entitled to rely on Clause 3 which provided for the use of substitute vessels. The clause was separate from the typical liberty clause found in the first paragraph. Yang Machine was an experienced shipper and had contracted with Sea–Land for shipments of cargo over 100 times prior to this occasion. Yang Machine concedes that on some of these shipments, substitute vessels may have been employed for part of the voyage, but Yang Machine never made an objection. Because the contract of carriage provided for the right to transship, Sea–Land's restowage of the cargo onto the SEALAND PATRIOT was not a deviation, or serious departure, from that contract.

Because notice of Sea–Land's right to use substitute vessels was provided in the bill of lading, we need not address the questions of whether the doctrine of deviation should be limited to geographical deviations and unauthorized on-deck stowage or whether the unadvertised use of substitute vessels is customary in the trade.

## II.  *$500–Per–Package Limitation*

Sea–Land argues that because no deviation occurred here, the district court erred in refusing to limit Sea–Land's liability to $500 per package.

In this circuit, a carrier may take advantage of COGSA's $500 liability limit if the shipper is given a fair opportunity to opt out of that limitation by declaring a higher value and paying a correspondingly higher freight rate. *See Mori Seiki USA, Inc. v. M.V. Alligator Triumph,* 990 F.2d 444, 448 (9th Cir.1993); *Institute of London Underwriters v. Sea–Land Serv., Inc.,* 881 F.2d 761, 766 (9th Cir.1989). If the bill of lading contains an express, legible recitation of the $500 limitation, and of the opportunity to declare a higher value, the bill of lading will constitute prima facie evidence that the shipper was given the requisite fair opportunity.

*See Travelers Indem. Co. v. Vessel Sam Houston,* 26 F.3d 895, 898 (9th Cir.1994).

The bill of lading in this case met these requirements. Clause 17 legibly gave notice of the $500 liability limitation, and Clause 23 on the face of the bill provided a space to declare a higher value for the cargo. Therefore, the burden shifted to Yang Machine to prove that it was not given a fair opportunity to declare a higher value. *See Nemeth,* 694 F.2d at 611.

Yang Machine argues that it was not given a fair opportunity to declare a higher value because Clause 17 in the bill of lading, although providing notice of the $500 limit, permitted the shipper to recover only the invoice value of the cargo in case of loss or damage, rather than its market value. Clause 17 provided in pertinent part:

> In the event of loss, damage or delay to or in connection with goods exceeding in actual value ... $500 ... the value of the goods shall be deemed to be $500 per package or unit, unless the nature and higher value of goods have been declared by the shipper herein and extra charge paid as provided in Carrier's tariff. *However, Carrier's liability shall not exceed the invoice value of the goods.*

(emphasis added). Yang Machine maintains that by attempting to limit its total liability to the invoice value (which it alleges does not include shipping costs and profit), rather than the market value of the goods, Sea–Land effectively deprived Yang Machine of a fair opportunity to declare the full value of its cargo and therefore may not rely upon the $500–per–package limitation.

Yang Machine's arguments are unconvincing. We fail to see how the bill of lading clause limiting recovery to the invoice value actually prevented Yang Machine from declaring a higher value, when Yang Machine "never even inquired about making such a declaration, much less took steps towards actually declaring the value of its cargo." *See General Elec. Co. v. MV Nedlloyd,* 817 F.2d 1022, 1029 (2d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988).[4] Because Yang Machine had shipped

---

4. In *Nedlloyd,* the shipper was estopped from

arguing that the carrier's high ad valorem rate

with Sea–Land on numerous prior occasions, it was familiar with Sea–Land's bill of lading and knew it could declare a higher value, but apparently chose not to do so to avoid paying a higher freight rate. Therefore, the limitation on recovery to the invoice value of the goods did not play a part in denying Yang Machine a fair opportunity to declare value; instead, it was Yang Machine's own cost-benefit analysis which prevented it from doing so.[5]

Moreover, Yang Machine chose to insure its cargo, and it received payment when the cargo was damaged. Yang Machine thereby made a deliberate choice to forego the additional freight costs of declaring a higher value. *See Travelers Indem.*, 26 F.3d at 900 ("[A] shipper who chooses to insure its cargo through an independent insurance company has made a conscious decision not to opt out of COGSA's [$500] liability limitation.").

Therefore, we find that Yang Machine did not meet its burden of proving that it was denied a fair opportunity to declare a higher value. Sea–Land was thus entitled to limit its liability to $500 per package under COGSA.

### CONCLUSION

Sea–Land did not commit a deviation from the contract of carriage. The contract provided notice that substitute vessels could be used to transport the cargo for part of the carriage. Sea–Land provided Yang Machine with a fair opportunity to declare a higher value, and Yang Machine failed to do so.

on the total declared value of the cargo prevented it from declaring its value, where the shipper took no steps toward declaring value and the evidence indicated that the shipper made a business decision not to obtain greater protection at a higher freight rate. 817 F.2d at 1029.

5. *Otis McAllister & Co. v. Skibs*, 260 F.2d 181 (9th Cir.1958), *cert. denied*, 359 U.S. 915, 79 S.Ct. 584, 3 L.Ed.2d 576 (1959), which was not cited by the parties in their original briefs or in oral argument, invalidated a bill of lading clause that limited the carrier's liability to the invoice value plus freight, insurance, and duties. *Otis McAllister*, however, did not involve the fair opportunity question which is at issue here. As Gilmore and Black noted:

> The basis for fixing damages for loss of cargo under the general law is the market price at the port of destination.... Before COGSA

Sea–Land's liability was thus limited to $500 per package. We therefore reverse and remand the case to enter judgment for Yang Machine in the amount of $1,000.

**REVERSED AND REMANDED.**

was enacted, it seems to have been a common practice for the bill of lading to stipulate for "invoice plus disbursements (freight and insurance)" as the measure of loss, and these stipulations were upheld. Under COGSA, it has been held that such a clause, when it "lessens" the carrier's liability, offends [46 U.S.C.App. § 1303(8)].

Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 188–89 (2d ed. 1975). *Otis McAllister* was one of the cases referred to above by Gilmore and Black which invalidated the invoice value clause as a binding measure of damages. The case did not concern whether the invoice value clause itself deprived the shipper of a fair opportunity to declare a higher value. Therefore, we find that *Otis McAllister* is inapplicable in the instant case.