**VISION AIR FLIGHT SERVICE, INC.,**
a Philippine Corporation,
Plaintiff–Appellant,

v.

**M/V NATIONAL PRIDE, in rem,**
Madrigal–Wan Hai Lines,
Defendants–Appellees,

National Development Co., Pix Line, Phoenix International Freight Services, Ltd., and Commercial Union Insurance Company, Defendants.

No. 97–16839.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 12, 1998.

Decided Sept. 22, 1998.

Leopoldo J. Chanco, Jedeikin, Green, Meadows & Schneider, San Francisco, CA, for plaintiff–appellant.

John D. Giffin and Shannon S. Wagoner, Keesal, Young & Logan, San Francisco, CA, for defendant–appellee.

Before: HALL and THOMAS, Circuit Judges, and MOSKOWITZ, * District Judge.

MOSKOWITZ, District Judge:

Appellant Vision Air Flight Service, Inc. ("Vision Air" or "Vision") appeals the district court's grant of partial summary judgment in favor of Appellees Madrigal–Wan Hai Lines Corp. and M/V National Pride (collectively, "Madrigal") limiting Madrigal's liability to $1000 for the destruction of two airport refueling trucks ("the refuelers") that Madrigal contracted to ship and allegedly destroyed. Because the evidence, viewed in the light most favorable to Appellant, creates a triable issue as to whether one of the refuelers was destroyed intentionally, we vacate the district court's grant of partial summary judgment as to liability for damage to that refueler and remand for further proceedings.

I

Vision Air purchased two refurbished airport refueling trucks (the "refuelers") from a Kansas supplier. The refuelers were purchased for use at the Subic Bay International Airport in the Republic of the Philippines. Through an intermediary, Vision Air arranged to have the refuelers shipped from Oakland, California to Manila.

In October 1995, Madrigal issued its bill of lading to serve as the contract of carriage for the shipment of the refuelers. The bill of lading included a clause that purported to limit Madrigal's liability to $500 on the entire shipment pursuant to the Carriage of Goods at Sea Act, 46 U.S.C.App. §§ 1300–1315 ("COGSA"), and which advised Vision that it could opt for higher liability by paying an increased freight charge. Vision declined to do so, and instead insured the refuelers with an independent insurance company.

The refuelers were carried aboard Madrigal's vessel M/V National Pride, and were discharged at the Manila International Container Port on October 17, 1995. A Vision Air representative, Anthony Jamora, was present at the pier to observe the off-loading of the refuelers. According to the uncontroverted declaration of Mr. Jamora, the refuelers were off-loaded using the ship's own cranes. The stevedores in charge of unloading the trucks attached cables to each end of the truck, but did not use spreader bars to keep the cables away from the sides and the bottom of the trucks. Nor did they use a platform under the trucks. Instead, the stevedores used tires as cushions between the trucks and the cables.[1]

When the first truck was lifted by the ship's cranes, the cables shifted due to the weight of the truck settling into the sling formed by the cables. This caused the re-

---

* The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District of California, sitting by designation.

1. Vision Air also submitted the declaration of Arun K. Jolly, who has nine years of experience as a marine surveyor performing cargo surveys, loss prevention, and loss investigation. Mr. Jolly stated that the proper method of off-loading would have been to use spreader bars and a metal platform, whereby the refueler would be placed on the platform and the cables attached to the platform. The spreader bars would then be attached to the ship's crane so that the wires would not contact the refuelers when the platform was hoisted. Mr. Jolly further opined that because no spreader bars were used, "it was a foregone conclusion that the wire cables used by the stevedores would cut into the body work of the heavy trucks, notwithstanding the use of old truck tires as buffers.... The stevedores, by not following standard custom and practice and prudent seamanship in loading and unloading the trucks involved in this case from the vessel onto the pier, should have known that their use of wire slings without spreader bars would certainly cause damages to the trucks."

fueler to jolt noticeably and swing in the air. After the first refueler was placed on the pier and the cable strapping removed, severe damage was visible. It appeared that the cables had crushed the sides of the truck's refueling tank, crushed its doors and fenders, and damaged its underside.

Despite the visible damage that had resulted from the off-loading of the first refueler, the stevedores proceeded to off-load the second refueler in precisely the same fashion. Not surprisingly, the second refueler suffered damage similar to that incurred by the first. Both trucks were a total loss.

Vision Air brought suit against Madrigal seeking to recover damages resulting from destruction of the refuelers. Shortly thereafter, Madrigal filed a motion for partial summary judgment to limit its liability to $500.00 per refueler pursuant to the bill of lading and COGSA's liability limitation provision. The district court granted Madrigal's motion and issued an order granting partial summary judgment, limiting Madrigal's liability to $1000.00.

## II

We have jurisdiction to hear this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(3), and review a partial grant of summary judgment de novo. *See Amdahl Corp. v. Profit Freight Systems, Inc.*, 65 F.3d 144, 146 (9th Cir.1995). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there is any genuine issue of material fact and whether the district court correctly applied the relevant substantive law. *See id.*

■ Vision Air contends the district court's grant of partial summary judgment was erroneous on two grounds. First, Vision argues that the limitation of liability provision in the bill of lading was invalid, because it failed to give adequate notice that liability was limited under COGSA. Second, Vision maintains that Madrigal's manner of off-loading the refuelers constituted an unreasonable deviation, rendering COGSA's liability limitation inapplicable. Madrigal, on the other hand, contends that its liability is properly limited to $1000.00.[2]

## A

COGSA regulates the terms of international ocean carriage covered by bills of lading. Section 4(5) of COGSA limits a carrier's liability for loss and damage to goods shipped:

> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C.App. § 1304(5).

■ A carrier may limit its liability under COGSA "only if the shipper is given a 'fair opportunity' to opt for a higher liability by paying a correspondingly greater charge." *Nemeth v. General Steamship Corp., Ltd.*, 694 F.2d 609, 611 (9th Cir.1982). The carrier has the initial burden of producing *prima facie* evidence showing that it provided notice to the shipper that it could pay a higher rate and opt for higher liability. *See Royal Insurance Co. v. Sea–Land Service, Inc.*, 50 F.3d 723, 726 (9th Cir.1995). The carrier satisfies this initial burden by legibly reciting the terms of 46 U.S.C.App. § 1304(5) or language to the same effect in the bill of lading.[3] *See id.* The burden then shifts to the ship-

**2.** At oral argument, counsel for Madrigal suggested that Madrigal cannot be held vicariously liable for the stevedores' conduct. This argument was not raised in Madrigal's brief submitted to this Court, and was not raised in its motion for partial summary judgment or its amended answer filed in the district court. The issue of vicarious liability was neither presented to, nor decided by, the district court. Consequently, there has been no factual record developed with regard to this issue and we do not consider it on this appeal. *See Bolker v. Commission of Internal Revenue*, 760 F.2d 1039 (9th Cir.1985).

**3.** The required language need not be prominent to meet the "fair opportunity" requirement. It need not appear on the front of the bill of lading and may appear in fine print. Further, a specific space for the shipper to declare a higher value is not required. *See Mori Seiki USA, Inc. v. M/V Alligator Triumph*, 990 F.2d 444, 449 (9th Cir. 1993).

per to prove it was denied such an opportunity. *See id.* at 727.

Here, the bill of lading for shipment of the refuelers contained the following provision, which purported to limit liability:

> Where container(s) is loaded by the shipper or on his behalf and/or freight rate is charged per container, carrier's liability will be limited to U.S. dollars 500 regardless of the contents of each container except when the shipper declares ad valorem valuation on the face hereof and pays additional freight on such declared valuation. The freight rate charged when no higher valuation is declared by the shipper is based on valuation of U.S. Dollar 500 per container, bundle, skid, pallet, or other unit, or where goods are received by the carrier breakbulk, the carrier's liability shall be limited to U.S. Dollar 500 per carton, bundle, skid, pallet or other unit, except when the shipper declares ad valorem value herein and pays additional freight as above.

As is clear from its language, the bill of lading explicitly limited liability to $500 and invited Vision to declare a higher value and pay additional freight. This language tracks COGSA § 4(5) and is quite similar to other limitation of liability provisions that have been held to provide notice sufficient under COGSA. *See Carman Tool & Abrasives, Inc. v. Evergreen Lines,* 871 F.2d 897, 899–900 n. 4 (9th Cir.1989); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 146 (1st Cir.1994). Because the bill of lading explicitly limited Madrigal's liability and invited Vision Air to opt for higher liability, it provided the notice that COGSA requires. Thus, Madrigal has made its *prima facie* showing, and the burden shifts to Vision Air to prove it was denied such an opportunity. *See Royal Insurance,* 50 F.3d at 726.

Having been notified in the bill of lading that it may opt for higher liability, Vision declined to declare ad valorem value and pay additional freight. Instead, Vision chose to insure the cargo with an independent insurance carrier. This decision in and of itself demonstrates that Vision knew liability was limited by COGSA, and that Vision made a conscious decision *not* to opt out of the liability limitation. *See Yang Machine Tool Co. v. Sea–Land Service, Inc.,* 58 F.3d 1350, 1355 (9th Cir.1995) (citing *Travelers Indem. Co. v. Vessel Sam Houston,* 26 F.3d 895, 900 (9th Cir.1994) ( "[A] shipper who chooses to insure its cargo through an independent insurance company has made a conscious decision not to opt out of COGSA's liability limitation.")). Vision cannot contend that it was not given a "fair opportunity" to opt for higher coverage precisely because Vision *did* opt for higher coverage when it insured the refuelers through an independent entity.

Sweeping the issue of notice and "fair opportunity" aside, Vision maintains the liability limitation provision in the bill of lading is rendered null and void by operation of section 3(8) of COGSA, which provides that any contract or agreement lessening the statutory liability of the carrier below the limits set by COGSA is null and void. *See* 46 U.S.C.App. § 1303(8).[4]

Vision Air argues that the bill of lading improperly attempted to limit liability to $500 for the shipment of both refuelers by defining the two refuelers as one "container." Vision contends that because COGSA only permits a limitation of $500 per customary freight unit and each refueler is a customary freight unit, the bill of lading was rendered void by § 3(8) as an attempt to reduce liability below the floor set by COGSA. The gist of Vision's argument is that any language in the bill of lading that purports to reduce liability below the floor set by COGSA voids the entire limitation of liability clause, regardless of notice, and renders COGSA inapplicable. This is simply not the law.

If a limitation of liability provision in a bill of lading merely misdefines a "package" or "customary freight unit" under COGSA, that does not void the limitation of liabili-

---

4. Section 3(8) provides:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability.

46 U.S.C.App. § 1303(8).

ty provision altogether and render COGSA inapplicable. Rather, COGSA's limitation of $500 per "package" or "customary freight unit" simply applies to each package or customary freight unit, properly defined. *See All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu,* 7 F.3d 1427, 1433 (9th Cir.1993).

In *All Pacific,* a bill of lading purported to limit the carrier's liability to $500 per container, regardless of the contents of the container. *See id.* at 1433. The district court applied COGSA's limitation of liability to each package within the container, and defendants appealed. We held that this was a proper application of COGSA based on the terms of section 3(8), because section 3(8) voided any attempt to reduce liability below the floor set by COGSA. *See All Pacific,* 7 F.3d at 1433 (holding the number of packages in each container determined the number of "packages" for COGSA purposes). Were Vision correct in its argument, we would have held the limitation in *All Pacific* void altogether.

When faced with a carrier's attempt to reduce liability through enterprising definitions of "package," other courts have simply redefined "package" or "customary freight unit" according to the dictates of COGSA. *See, e.g., Universal Leaf Tobacco v. Companhia De Navegacao,* 993 F.2d 414, 417 (4th Cir.1993); *Shinko Boeki Co., Ltd. v. S.S. Pioneer Moon,* 507 F.2d 342, 345 (2d Cir. 1974). Other courts have not, as Vision urges this Court to do, held the limitation of liability provision void altogether.

Whether or not the bill of lading "mislabeled" or "misbundled" freight units, it nonetheless gave Vision notice that Madrigal's liability was limited, and invited Vision to opt for a higher liability by paying a correspond-

ingly greater freight charge. This is all COGSA requires. *See Royal Insurance,* 50 F.3d at 726; *Nemeth,* 694 F.2d at 611. If Vision Air was somehow misled into thinking that liability was limited to $500 for *both* refuelers, then this would only give Vision a greater incentive to declare an ad valorem valuation. Notice was therefore enhanced, if anything.

■ The fact that Vision chose to insure the refuelers demonstrates it had actual notice that Madrigal's liability was limited and that it was given a "fair opportunity" to opt for higher coverage. COGSA's liability limitation therefore applies. Each unpackaged refueling truck is properly defined as a customary freight unit[5] under COGSA, and the district court therefore did not err in holding that the bill of lading properly invoked COGSA's liability limitation.[6]

**B**

Vision argues that even if the limitation of liability provision in the bill of lading is valid under COGSA, it was rendered void under the doctrine of deviation. Because the uncontroverted evidence, viewed in a light most favorable to Vision Air, would allow a reasonable trier of fact to conclude that destruction of the second refueler was intentional, we agree, but only as to the second refueler.

At common law, a geographic deviation from a scheduled voyage stripped a carrier of many of its defenses to liability and made the carrier the effective insurer of the goods that it was carrying. *See generally* Steven F. Friedell, *The Deviating Ship,* 32 Hastings L.J. 1535 (1981). Upon deviation from the scheduled voyage, a carrier was not permitted to rely upon exculpatory provisions in the bill of lading to avoid or limit its liability for

---

**5.** Vision's argument that the bill of lading's liability limitation clause cannot apply to freestanding cargo is unavailing. The bill of lading invokes a liability limitation of $500 "per container, bundle, skid, pallet or other unit." The refuelers were not shipped in a container, in a bundle or on a skid or pallet, and are therefore most naturally interpreted to each constitute an "other unit." Here, freight was calculated on a per vehicle basis in the bill of lading. Each vehicle therefore constitutes a customary freight unit for the purposes of COGSA. *See, e.g., FMC Corp. v. S.S. Marjorie Lykes,* 851 F.2d 78, 80 (2d Cir.1988) (holding each fire engine shipped to be a custom-

ary freight unit for COGSA purposes); *General Electric Co. v. Inter–Ocean Shipping,* 862 F.Supp. 166, 170 (S.D.Tex.1994) ("Unboxed motor vehicles are customary freight units in themselves.").

**6.** The Court need not reach Vision Air's contention that it was not on constructive notice of Madrigal's liability limitation because Madrigal's tariff was not properly filed with the Federal Maritime Commission. When a bill of lading provides a shipper with a fair opportunity to avoid the liability limitation, the language of any tariff is irrelevant to the fair opportunity issue. *See Royal Insurance,* 50 F.3d at 729.

loss or damage to cargo. The basis for this doctrine was the understanding between shipper and carrier that the carrier would not stray from the customary course of the voyage it contracted to undertake. *See The Willdomino v. Citro Chemical Co. Of America*, 272 U.S. 718, 727, 47 S.Ct. 261, 71 L.Ed. 491 (1927); *The Sarnia*, 278 F. 459, 464 (2d Cir.1921). When the carrier breached the contract of carriage by deviating from the agreed upon voyage, it was regarded to have exposed the cargo to such additional and unanticipated risk as to constitute a fundamental breach of the contract of carriage. *See, e.g., The Sarnia*, 278 F. at 463–64. Having breached the contract in such a fundamental manner, the carrier was not permitted to rely on exculpatory provisions in the bill of lading, such as limitations on liability. *See id.; Switzerland General Ins. Co. v. Navigazione Libera Triestina, S.A.*, 91 F.2d 960, 962 (2d Cir.1937).[7]

Though the deviation doctrine was originally limited to instances of geographic deviation, its underlying rationale applied readily to other situations whereby the carrier exposed the cargo to unreasonable and unjustifiable risks not contemplated by the parties. Consequently, the doctrine was expanded beyond the geographic context to encompass certain breaches of the contract of carriage serious enough to merit the harsh consequences the deviation doctrine imposes. *See* 2A Benedict on Admiralty, § 123 at p. 12–11 (1998). Such breaches came to be known as "quasi-deviations."

The most prominent example of quasi-deviation was stowage of cargo on deck. In *St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral Commercial do Rio de Janeiro*, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923), the Supreme Court applied the deviation doctrine to unauthorized storage of goods on deck. In that case, the bill of lading for the shipment in question did not explicitly state that the goods would be shipped below deck. To the contrary, a prior freight agreement entered into before the bill of lading was issued permitted shipment of the goods "on or under deck, ship's option." *Id.* at 123, 44 S.Ct. 30. Nevertheless, the Court reasoned that the issuance of a "clean bill of lading amounted to a positive representation by [the ship] that ... the goods would go under deck." *Id.* at 124, 44 S.Ct. 30. The Court went on to hold:

> By stowing the goods on deck the vessel broke her contract, exposed them to greater risk than had been agreed and thereby directly caused the loss. She accordingly became liable as for a deviation, [and] cannot escape [liability] by reason of the relieving clauses inserted in the bill of lading for her benefit....

*Id.*

Although on-deck stowage is the most prominent example of quasi-deviation, the Supreme Court's holding that on-deck stowage constituted a deviation was not a remarkable one.[8] Courts of the period viewed the

7. Under principles of general maritime law recognized by courts of the early nineteenth century, a carrier was held strictly liable for cargo damage or loss incurred during the course of a voyage unless it could prove (1) that its negligence had not contributed to the loss and (2) that one of four "excepted causes" (act of God, act of public enemies, shipper's fault, or inherent vice of the goods) was responsible for the loss. *See* 2A Benedict on Admiralty § 11 2–1 (1998) (citing *Propeller Niagara v. Cordes*, 62 U.S. (21 How.) 7, 23, 16 L.Ed. 41 (1858); *Associated Metals & Minerals Corp. v. Alexander's Unity MV*, 41 F.3d 1007, 1014–15 (5th Cir.1995)). In order to avoid this extensive no-fault liability, carriers began to use exculpatory clauses in their bills of lading to limit their liability.

Upon passage of the Harter Act of 1893, 27 Stat. 445 (codified at 46 U.S.C.App. §§ 190–196) carriers were prohibited by statute from disclaiming "liability for loss or damage arising from negligence, fault, failure in proper loading, stowage, custody, care or proper delivery" of cargo. 46 U.S.C.App. § 190. Though carriers could not avoid liability for such loss or damage altogether, they were permitted to limit their liability through "agreed valuation clauses," pursuant to which a shipper agreed that the cargo was not worth more than a stated sum per package. Through the aggressive use of such clauses, carriers "could effectively limit their liability to a sum well below the actual damage suffered." 2A Benedict on Admiralty, § 12 at 2–5 (1998). Thus, the question that arose under the Harter Act was whether a particular deviation rendered void an "agreed valuation clause" in the bill of lading for the shipment in question.

8. The Supreme Court in *St. Johns* recognized that if there was a port custom permitting on-deck stowage, there would be no deviation. Thus, we have held that placement of containerized cargo on the deck of a specially constructed

principles underlying the deviation doctrine with some degree of breadth. Regarding the notion of deviation, the Second Circuit noted:

> It was originally employed, no doubt, for the purpose its lexicographical definition implies, namely, to express the wandering or straying of a vessel from the customary course of voyage; but it seems now to comprehend in general every conduct of a ship or other vehicle used in · commerce tending to vary or increase the risk incident to a shipment.

*The Sarnia*, 278 F. at 464 (quoting *The Indrapura*, 171 F. 929, 931 (D.Or.1909) (holding placement of a vessel in dry dock with cargo aboard constituted a deviation)). Similarly, the Third Circuit noted:

> As applied in admiralty law, the term 'deviation' was originally and generally employed to express the wandering or straying of a vessel from the customary course of the voyage, but in the course of time it has come to mean any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased, such as carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper, delay in carrying the goods, failure to deliver the goods at the port named in the bill of lading and carrying them farther to another port, or bringing them back to the port of original shipment and reshipping them. Such conduct has been held to be a departure from the course of agreed transit and to constitute a 'deviation' whereby the goods have been subjected to greater risks, and, when lost or damaged in consequence thereof, clauses of exceptions in bills of lading limiting liability cease to apply.

*G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt–Actien–Gesellschaft*, 28 F.2d 249, 251 (3d Cir.1928).

Based on the cases discussed above, it is clear that courts of the pre-COGSA era were concerned about imposing upon shippers unreasonable risks that they had not bargained to bear. The sort of activity that triggered invocation of the deviation doctrine and therefore became the object of scrutiny was determined largely by the extent, scope, and nature of the risk it imposed on the cargo. Though the touchstone of deviation was the notion that a carrier had somehow breached the contract of carriage in a fundamental way, courts did not require the breach of an explicit contractual clause. *See, e.g., St. Johns*, 263 U.S. at 123–24, 44 S.Ct. 30 (holding that clean bill of lading implied a promise that goods would be shipped below deck). Rather, the doctrine of deviation was designed to enforce adherence to certain assumptions relating to specific activities a carrier was or was not expected to undertake.

Although this open-ended rationale might conceivably encompass a wide variety of conduct, the enactment of COGSA altered the contours of the deviation doctrine and limited the circumstances under which it applies. It is against this backdrop of COGSA which the deviation doctrine must now be interpreted.

Enacted in 1936, COGSA is a fault-based liability system that reflects a compromise of rights and liabilities between cargo interests and carriers. "One purpose of COGSA is to 'protect shippers from the overreaching of carriers through contracts of adhesion and to provide incentive for careful transport and delivery of cargo.'" *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.*, 32 F.3d 1244, 1251 (8th Cir.1994) (quoting *Cameco, Inc. v. S.S. American Legion*, 514 F.2d 1291, 1300 (2d Cir.1974)). To this end, COGSA imposes upon carriers certain affirmative duties designed to ensure the safe transport of cargo, the breach of which results in liability for loss or damage to cargo. *See, e.g.*, COGSA § 3(1), 46 U.S.C.App. § 1303(1)(a) (requiring that a carrier provide a seaworthy ship); COGSA § 3(2), 46 U.S.C.App. § 1303(2) (requiring the carrier to "carefully load, handle, stow, keep, care for, and discharge the goods carried").

The major compromise that · COGSA strikes relates to the amount of liability a carrier faces for breach of the affirmative duties COGSA imposes. At the time of COGSA's enactment, bills of lading often limited the liability of carriers to $100 or less

---

container ship pursuant to a port or trade custom would not constitute a deviation. *Konica Business Machines v. Vessel Sea–Land Consumer*, 47 F.3d 314 (9th Cir.1995)(reversing grant of summary judgment), *aff'd after remand*, 153 F.3d 1076 (9th Cir.1998).

per package. *See Jones v. The Flying Clipper*, 116 F.Supp. 386, 388 (S.D.N.Y.1953). One of the goals of COGSA was therefore to do away with these paltry limits [9] and establish a *minimum* per package liability of $500. *See id.* (citing hearings before the Senate Committee on Commerce on S. 1152, 74th Cong., 1st Sess. (1935), p. 47); *see also* COGSA § 3(8), 46 U.S.C.App. § 1303(8) (nullifying any attempt to reduce liability below amount specified by COGSA). On the other hand, *maximum* liability was also set at $500, unless the shipper chose to pay higher freight in return for a higher valuation. *See* COGSA § 4(5), 46 U.S.C.App. § 1304(5) (limiting carrier's liability *"in any event"* to $500 unless shipper declares a different value) (emphasis added).

Following the enactment of COGSA, there was some question as to whether the language of § 4(5), which limited liability to $500 "in any event," did away with the doctrine of deviation. The first court to address the argument answered in the negative, and held that an unreasonable deviation by a carrier deprives it of the benefit of the $500 per package liability limitation under § 4(5). *See Jones*, 116 F.Supp. at 391. The *Jones* court observed:

> The purpose of the $500 limitation in [46 U.S.C.App.] § 1304(5) was to prevent a stipulated value for cargo in a lesser amount and to do away with the then current limits imposed by carriers, usually $100 or even a smaller sum. Except for this change in amount, the provision of the Act did not represent any basic departure from existing law. Neither the Convention nor the Act contains any provision concerning the legal result of an unjustifiable deviation. There is nothing in the history of the Act to indicate that Congress by fixing the limitation at $500 intended to displace the doctrine of unjustifiable deviation which was so firmly entrenched in maritime law. Such a drastic change in the existing law, with its far-reaching consequences in the commercial and financial world would have been expressed in clear and unmistakable terms.

*Id.* at 388–89.

In upholding the continued vitality of the deviation doctrine, the *Jones* court again focused on the notion that certain acts expose the cargo to unanticipated risks that so change the essence of the contract of carriage as to effect its abrogation. *See id.* at 389–90. In addition, the court expressed great hostility to the notion that COGSA could immunize a carrier against the consequences of its own willful misconduct. *See Id.* at 390.

Following *Jones*, every circuit to consider the issue but one has reached the same conclusion: the doctrine of deviation survives the enactment of COGSA and renders void its $500 per package liability limitation when the carrier commits an unreasonable deviation. *See, e.g., SPM Corp. v. M/V Ming Moon*, 965 F.2d 1297, 1303 (3d Cir.1992); *Nemeth v. General Steamship Corp., Ltd.*, 694 F.2d 609, 611 (9th Cir.1982); *Calmaquip Eng'g West Hemisphere Corp. v. West Coast Carriers, Ltd.*, 650 F.2d 633 (5th Cir.1981); *Spartus Corp. v. S.S. Yafo*, 590 F.2d 1310 (5th Cir.1979); *Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68 (2d Cir.1974); *Du Pont de Nemours Int'l S.A. v. S.S. Mormacvega*, 493 F.2d 97 (2d Cir.1974); *Searoad Shipping Co. v. E.I. duPont de Nemours & Co.*, 361 F.2d 833 (5th Cir.1966); *but see Atlantic Mutual Ins. Co. v. Poseidon Schiffahrt*, 313 F.2d 872 (7th Cir.1963) (holding that even a carrier's unreasonable deviation from the contract of carriage will not void COGSA's liability limitation).

Nevertheless, courts and commentators agree that the doctrine should be sharply limited and have displayed a certain hostility toward expansion of the deviation doctrine, especially in the context of quasi-deviation. *See, e.g., Rockwell International Corp. v. M/V Incotrans Spirit*, 998 F.2d 316, 318–19 (5th Cir.1993) (refusing to extend deviation doctrine to cover damage to cargo resulting from negligence in off-loading); *Universal Leaf Tobacco Co. v. Companhia De Navegacao Maritima Netumar*, 993 F.2d 414, 417

---

**9.** In one instance, the Second Circuit upheld a $5 per package valuation clause. *See Hugetz v. Compania Transatlantica*, 270 F. 90 (2d Cir. 1920).

(4th Cir.1993) (declining "to extend the unreasonable deviation doctrine beyond its current boundaries"); *SPM*, 965 F.2d at 1304 ("We agree with our sister circuits that the doctrine of quasi-deviation should not be viewed expansively in the post-COGSA era."); *B.M.A. Industries, Ltd. v. Nigerian Star Line, Ltd.*, 786 F.2d 90, 92 (2d Cir.1986) ("The principle of quasi-deviation is arguably inconsistent with COGSA, and is not one to be extended."); Grant Gilmore and Charles Black, *The Law of Admiralty* 182–83 (2d ed.1975) (noting that "[i]t would seem unwise to extend analogically and by way of metaphor a doctrine of doubtful justice under modern conditions, of questionable status under [COGSA], and of highly penal effect"); Thomas J. Schoenbaum, *Admiralty and Maritime Law* 603 (2d ed. 1994) ("The doctrine of 'quasi-deviation' is at least arguably inconsistent with COGSA and should not be extended.").[10]

Because COGSA represents a fault-based liability scheme, this broad trend is not surprising. COGSA imposes a variety of duties on carriers, and provides an explicit remedy for the breach of these duties. When a carrier breaches a duty that COGSA itself imposes, COGSA provides the shipper's sole remedy.

■ For instance, COGSA imposes an affirmative duty on a carrier to "carefully load, handle, stow, keep, care for, and discharge the goods carried." 46 U.S.C.App. § 1303(2). It is therefore not surprising that mere negligence or lack of due diligence in the handling, care, stowage, or delivery of cargo does not constitute a deviation. *See Nemeth*, 694 F.2d at 613; *SPM*, 965 F.2d at 1304 n. 6; *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 32 (2d Cir.1986). Similarly, COGSA imposes a duty on carriers to provide a seaworthy ship. *See* 46 U.S.C.App. § 1303(1)(a). It is therefore not surprising that the Second Circuit has held that failure to provide a seaworthy ship does not constitute an unreasonable deviation that voids COGSA's liability limitation, even where the carrier is on notice of the defect. *See Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68, 71–72 (2d Cir.1974).

The fact that COGSA allocates liability for many of the risks associated with shipment of goods by sea does not mean that it operates to allocate every conceivable risk of misconduct. As the misconduct in question becomes more culpable, it becomes more likely that such misconduct might never have been contemplated or anticipated by COGSA. Put another way, Congress, in enacting COGSA, may never have intended that extraordinarily culpable misconduct fall within the terms of the compromise it struck between the interests of shippers and carriers. Certain egregious misconduct may be so unreasonable and may fall so far outside the parties' reasonable expectations that it was simply not contemplated.

A more difficult case is therefore presented by a carrier's gross negligence or recklessness. A shipper might argue that grossly negligent or reckless conduct runs so far afoul of the conduct a carrier might reasonably be expected to undertake that it falls outside the scope of culpable misconduct that COGSA anticipates. Yet the conduct a carrier might reasonably be expected to undertake is inevitably defined by maritime custom and practice. If recklessness is defined by reference to maritime custom and practice, then it might be difficult to distinguish between those departures from custom and practice which are reckless, or merely negligent. Presumably, this distinction would turn on the extent, degree, and magnitude of the departure. In this respect, the evaluation would unavoidably relate to the conduct a reasonably prudent carrier would be expected to undertake, which becomes indistinguishable from the negligence standard courts have unanimously rejected. *See, e.g., Nemeth*, 694 F.2d at 613.

---

**10.** Another fundamental objection to expansion of the doctrine seems to be that the doctrine is outmoded because modern insurance contracts now cover losses resulting from deviation. *See, e.g.*, Black and Gilmore, *supra* at 181–82. Yet, historically, application of the deviation doctrine did not turn on whether the goods were insured. *See* Friedell, *supra* at 1545 n. 45 (citing *United States Shipping Bd. Emergency Fleet Corp. v.*

*Rosenberg Bros. & Co.*, 12 F.2d 721, 723 (9th Cir.1926), *rev'd on other grounds* 276 U.S. 202, 48 S.Ct. 256, 72 L.Ed. 531 (1928); *The Citta Di Messina*, 169 F. 472, 475 (S.D.N.Y.1909)). Moreover, to the extent the deviation doctrine is concerned with providing an incentive for carriers not to undertake certain actions that impose unreasonable risks on cargo, insurance is irrelevant.

Because the recklessness inquiry collapses too easily into a negligence standard, it is not surprising that courts have rejected the argument that gross negligence or recklessness may constitute a deviation. *See Iligan,* 507 F.2d at 71–72 (rejecting gross negligence as a basis for deviation because every violation of COGSA's substantive duties would then require a detailed factual inquiry to distinguish gross negligence from plain negligence); *In Matter of Complaint of Tecomar S.A.,* 765 F.Supp. 1150, 1184 (S.D.N.Y.1991) (rejecting recklessness as a standard for the same reason).

We agree that the deviation doctrine should not be liberally expanded. Once again, we reject the notion that mere negligence may constitute an unreasonable deviation, as have all other courts which have considered the issue. Similarly, we reject the notion that gross negligence or recklessness may constitute an unreasonable deviation. That is not to say, however, that certain, more culpable misconduct cannot rise to the level of an unreasonable deviation.

In applying the doctrine of deviation, our decisions consistently focus on the extent to which a departure from the contract of carriage exposes the cargo to "unanticipated and additional risks." *Amdahl,* 65 F.3d at 147 (quoting *Nemeth,* 694 F.2d at 613); *Yang,* 58 F.3d at 1352 (same). As we explained in *Nemeth:*

> There is nothing in COGSA to indicate that shippers should anticipate the additional risks associated with unreasonable deviations. Indeed, in deciding whether to be bound by the liability limitation in COGSA Section 4(5) or pay for higher liability, a shipper is entitled to assume that his goods will not be subjected to such additional risks. The rationale behind the unreasonable deviation rule is sound, and has not been undermined by the enactment of COGSA.

**11.** The availability of insurance does not necessarily affect the question of who should bear the costs of certain losses. The argument for imposing unlimited liability on the carrier for certain fundamental breaches as presented in *Nemeth* is incentive-based. If a carrier is not immunized by a liability limitation, it will have more incentive to exercise care, or at least to not breach the contract of carriage in certain fundamental ways.

To hold that section 4(5)'s liability limitation is absolute, regardless of the carrier's actions, would permit a carrier to violate the terms of the bill of lading at will, knowing that its liability will be limited to $500 per package. The carrier would be immunized even from the consequences of a fundamental breach going to the essence of the contract. There is nothing in COGSA or its history to warrant such a result. *Nemeth,* 694 F.2d at 613 (citing *Jones,* 116 F.Supp. at 390).

Put a slightly different way, there are certain risks for which the shipper simply does not bargain. While mere negligence, or even recklessness, on the part of the carrier "may be considered an inherent risk of shipping," *Nemeth,* 694 F.2d at 613, certain more fundamental breaches may not. *Accord* Schoenbaum, *supra* at 603 ("A workable criterion for fundamental breach would be to reserve the doctrine for willful breaches of duty that subject the cargo to substantially increased risk of loss or damage.").[11]

 The intentional destruction of cargo is not a risk any shipper bargains to undertake or should expect to bear. The essence of the contract of carriage is that the carrier will transport the shipper's goods from one place to another. Yet this contract is rendered pointless by the carrier's intentional destruction of the goods en route. It is hard to conceive of a more fundamental breach going more to the essence of the contract, or one which more thoroughly frustrates the essential expectations of the parties. Having breached the contract of carriage so fundamentally, the carrier cannot be allowed to invoke the liability limitation it incorporates. *See Nemeth,* 694 F.2d at 613. Thus, we conclude that a carrier's intentional destruction of the very goods it contracts to transport constitutes an unreasonable deviation which renders inapplicable COGSA's limitation of liability provision.[12]

*See Nemeth,* 694 F.2d at 613. If a certain cost is not born by the carrier, it is irrelevant whether that cost is born by the shipper or the shipper's insurance carrier. Either way, it is a cost to maritime commerce that COGSA seeks to avoid, and the carrier's incentive to avoid a fundamental breach will be reduced.

**12.** Our holding does not alter the long-standing principle that no deviation occurs when a ship

**1176**

### C

 Proof of intent requires proof of a culpable state of mind. That is not to say, however, that an actor need necessarily intend or desire the consequences of his act in order to be found to have acted with intent. If "he believes the consequences are substantially certain to result" from his act, then the actor will be found to have acted with intent. Restatement (Second) of Torts § 8A (1965); *accord Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir.1989); *DeVoto v. Pacific Fidelity Life Ins. Co.*, 618 F.2d 1340, 1347 (9th Cir.1980) (Kennedy, J.); *City of San Francisco v. Philip Morris, Inc.*, 957 F.Supp. 1130, 1142 (N.D.Cal.1997).[13]

 Here, Mr. Jolly testified that because no spreader bars were used, "it was a foregone conclusion that the wire cables used by the stevedores would cut into the body work of the heavy trucks." Mr. Jolly also opined that the use of wire slings without spreader bars was certain to cause damage to the trucks.

Although this testimony might be sufficient to demonstrate that the damage was likely, or even substantially certain to occur, it provides no basis to conclude that the stevedores had any belief that such was the case. It does not support a finding of intent with respect to the first refueler because it would not allow a rational trier of fact to draw an inference as to the stevedores' state of mind.

 The same, however, cannot be said with respect to the second refueler. The severe damage to the first refueler that resulted from off-loading was visible upon removal of the cable strapping as the refueler sat on the pier. Nevertheless, the stevedores proceeded to off-load the second refueler in precisely the same manner as the first. Because the uncontroverted evidence suggests the stevedores were aware of the damage their chosen method of off-loading inflicted on the first refueler, a rational trier of fact might very well conclude that they knew the second refueler would suffer the same fate with substantial certainty.

The stevedores' state of mind and whether their destruction of the second refueler was intentional is a question of fact. *See DeVoto*, 618 F.2d at 1347. Because the record contains evidence that would allow a reasonable trier of fact to conclude that the second refueler was destroyed intentionally, we affirm the district court's grant of partial summary judgment as to the first refueler but vacate the grant of partial summary judgment as to the second refueler. This action is hereby remanded for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part and REMANDED, each party to bear their own costs.

---

seeks refuge or takes other actions for the safety or best interest of the crew, ship or cargo. *See, e.g., Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.*, 137 F.3d 1455, 1469 n. 47 (11th Cir.1998) (citing *The Malcolm Baxter, Jr.*, 20 F.2d 304, 305–06 (2d Cir.1927)); *The Turret Crown*, 297 F. 766, 776–77 (2d Cir.1924) (holding that a carrier may rely on exculpatory clauses in bill of lading when it deviates "as is necessary to save [the] ship and the lives of [the] crew").

Deviation has long been defined as a " 'voluntary departure without necessity, or any reasonable cause, from the regular and usual course" of the voyage. *Constable v. National S S Co.*, 154 U.S. 51, 66, 14 S.Ct. 1062, 38 L.Ed. 903 (1894) (quoting *Hostetter v. Park*, 137 U.S. 30, 40, 11 S.Ct. 1, 34 L.Ed. 568 (1890)). If the vessel or crew are in jeopardy, then necessity may require certain actions that would otherwise represent an unreasonable deviation. Thus, if rough weather required cargo to be thrown over board in order to save the ship, then a carrier would not commit an unreasonable deviation by throwing cargo overboard.

13. The distinctions between negligence, recklessness and intentionality may be understood as points on a continuum of probability:

> If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness.... As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence.

Restatement (Second) of Torts § 8A, cmt. b (1965).